Casey Daggett, Esq., SBN 345184
**CONSUMER EQUITY LEGAL**
43537 Ridge Park Drive, STE 100
Temecula, CA 92590
Telephone: (951) 840-1541
Casey@ConsumerEquityLegal.com

*Attorney for Plaintiffs Ashlynne Van Selus*
*and Brian Henderson*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ASHLYNNE VAN SELUS, an individual, and BRIAN HENDERSON, an individual,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**CROSSCOUNTRY MORTGAGE, LLC., an Ohio limited liability company; TOBIE LOVE, an individual; SELECT PORTFOLIO SERVICING, INC., a Utah Corporation; TRANS UNION, LLC, a Delaware limited liability company; EQUIFAX INFORMATION SERVICES, LLC, a Georgia limited liability company; EXPERIAN INFORMATION SOLUTIONS, INC., an Ohio corporation; and DOES 1 through 10, inclusive,**<br><br>**Defendants.** | Case No.:<br>Judge:<br>Dept.:<br><br>**COMPLAINT FOR:**<br><br>(1) **Violations of the Truth in Lending Act;**<br>(2) **Violations of the Real Estate Settlement Procedures Act;**<br>(3) **Fraudulent Misrepresentation;**<br>(4) **Negligent Misrepresentation;**<br>(5) **Breach of Fiduciary Duty and Professional Negligence;**<br>(6) **Conversion;**<br>(7) **Civil Theft;**<br>(8) **Violations of the Fair Debt Collection Practices Act;**<br>(9) **Violations of California's Rosenthal Act;**<br>(10) **Violations of the Electronic Funds Transfer Act;**<br>(11) **Violations of the Fair Credit Reporting Act; and**<br>(12) **Violations of California's Consumer Credit Reporting Agencies Act**<br><br>**[DEMAND FOR JURY TRIAL]** |

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

Plaintiffs Ashlynne Van Selus and Brian Henderson ("**Plaintiffs**") hereby submit this Complaint against Defendants CrossCountry Mortgage, LLC., an Ohio limited liability company ("**CCM**"); Tobie Love, an individual ("**Love**"), Select Portfolio Servicing, Inc., a Utah Corporation ("**SPS**"), Trans Union, LLC, a Delaware limited liability company ("**TransUnion**"), Equifax Information Services, LLC, a Georgia limited liability company ("**Equifax**"), Experian Information Solutions, Inc., an Ohio corporation ("**Experian**"), and DOES 1 through 10 (collectively, "**Defendants**") as follows:

## SUMMARY OF THE CASE

1.     This action arises from Defendants' fraudulent, deceptive, and illegal conduct causing Plaintiffs extreme financial damages and severe emotional anguish. In July of 2024, Plaintiffs wished to purchase a replacement residence when they were introduced to a representative of CCM, Tobie Love. Love and CCM initially provided Plaintiffs with reasonable mortgage terms with a represented interest rate of 6.125% and a down payment of $125,000.00—concretely outlining Plaintiff's financial responsibilities to complete their purchase of a replacement residence. Plaintiffs relied on these lending terms when they submitted an offer on their chosen property, attaching Love's loan approval letter thereof. Two weeks before closing on the Property, Love and CCM abruptly repudiated the original loan terms, unilaterally requiring Plaintiffs to provide a down payment of $250,000.00 (twice the original amount) and enter into a second loan with CCM to be serviced by SPS. Only at the close of escrow, when Plaintiffs were executing the final closing documents, were Plaintiffs informed that the second, unilaterally required mortgage, would be at an exorbitant interest rate of 11.25%. In servicing the second mortgage, SPS failed to credit Plaintiffs' payments to the account, falsely accused Plaintiffs of being delinquent, falsely furnished negative credit information to consumer reporting agencies, withheld escrow funds in an unauthorized escrow account, and repeatedly charged Plaintiffs' debit accounts without Plaintiffs' authorization.

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

2.     These actions of Defendants, and each of them, caused Plaintiffs significant financial harm, increased monthly payments, negative credit reporting with devastating financial impacts, and ongoing psychological suffering.

**JURISDICTION AND VENUE**

3.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under (1) the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, (2) the Real Estate Settlement Procedures Act, 12 U.S.C. § 2600, *et seq.*, (3) the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*, (4) the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, and (5) the Electronic Funds Transfer Act, 15 U.S.C. § 1693, *et seq.*

4.     This Court further has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), which states: "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states[.]"

5.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, Defendant Love and Defendant Experian reside in this District, and the Defendants transact substantial business in this District.

7.     Personal jurisdiction over Defendant Love and Defendant Experian is proper because Love and Experian reside in this District.

8.     Personal jurisdiction over Defendants CCM, SPS, TransUnion, and Equifax is proper in this District because they directed their promotional activities at California residences, conducted business in California through their financial interests in mortgage lending, mortgage servicing, and/or credit reporting, and purposefully availed themselves of the benefits of conducting business in California.

/ / /

2

**COMPLAINT FOR DAMAGES**

**PARTIES**

9.    Plaintiffs Ashlynne Van Selus and Brian Henderson ("**Plaintiffs**") are husband and wife, and at all times mentioned herein, natural persons residing in the City of Temecula, County of Riverside, in the State of California.

10.    Plaintiff Brian Henderson ("**Mr. Henderson**") is employed by JP Morgan Chase Bank as a financial adviser, managing over $92,000,000.00 ($92 million) in assets for his clientele. To maintain his employment with JP Morgan Chase Bank, Mr. Henderson is required at all times to comply with the regulatory requirements of the Financial Industry Regulatory Authority ("**FINRA**") as well JP Morgan Chase Bank's internal policies. As part of these requirements, Mr. Henderson can never become a financially risky individual, meaning Mr. Henderson's credit score and financial position are exceptionally important to maintain his employment.

11.    Defendant CrossCountry Mortgage ("**CCM**") is, and at all times mentioned herein was, an Ohio corporation with its principal place of business located at 2160 Superior Avenue E, Cleveland, OH 44114, Cuyahoga County.

12.    Defendant Tobie Love ("**Love**") is a natural person who, upon information and belief, resides at 35956 Wilcox Lane, Murrieta, CA 92562, Riverside County.

13.    Defendant Love, at all relevant times herein, worked as a mortgage loan officer for and through CCM. "Under the doctrine of respondeat superior, an employer may be held vicariously liable for torts committed by an employee within the scope of employment." *Mary M. V. City of Los Angeles*, 54 Cal. 3d 202, 208 (1991). The employer is liable "for the torts of an employee acting within the scope of his or her employment, whether or not the employer is negligent or has control over the employee." *Jeewarat v. Warner Bros. Entertainment, Inc.*, 177 Cal. App. 4th 427, 434 (2009).

14.    The conduct of Love herein was performed within the scope of her employment with CCM to the effect that CCM is vicariously liable for Love's conduct under the doctrine of respondeat superior.

3

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

15. Defendant Select Portfolio Servicing ("**SPS**") is, and at all times mentioned herein was, a Utah corporation, with its principal place of business located at 3217 S Decker Lake Drive, Salt Lake City, UT 84119, Salt Lake County.

16. Defendant Trans Union, LLC ("**TransUnion**") is, and at all times mentioned herein was, a Delaware limited liability company, with its principal place of business located at 555 West Adams Street, Chicago, IL 60661, Cook County.

17. Defendant Equifax Information Services, LLC ("**Equifax**") is, and at all times mentioned herein was, a Georgia limited liability company, with its principal place of business located at 1550 Peachtree Street NW, Atlanta, GA 30309, Fulton County.

18. Defendant Experian Information Solutions, Inc. ("**Experian**") is, and at all times mentioned herein was, an Ohio corporation, with its principal place of business located at 475 Anton Boulevard, Costa Mesa, CA 92626, Orange County.

19. Defendants TransUnion, Equifax, and Experian are consumer reporting agencies ("**Credit Reporting Agencies**") as defined under 15 U.S.C. § 1681a(f) of the Fair Credit Reporting Act, and each a "consumer credit reporting agency" as defined by the California Consumer Credit Reporting Agencies Act ("**CCRAA**").

20. Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed, believe, and thereon allege that each of these fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiffs' injuries as herein alleged were proximately caused by the aforementioned Defendants.

21. Unless otherwise indicated, the use of a Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of the Defendant named.

4

**COMPLAINT FOR DAMAGES**

## FACTUAL ALLEGATIONS

### A. CCM's Egregious and Deceptive Mortgages Imposed onto Plaintiffs

22.    In or about July 2024, Plaintiffs initiated the process to sell their current residence and to purchase a replacement residence for Plaintiffs and their children. Through Plaintiffs' realtor, Scott Gormley with Signature Real Estate Group, Plaintiffs were referred to Tobie Love of CCM in Murrieta, California. Thereof, Love and CCM agreed to act as Plaintiffs' loan officer and mortgage broker/lender.

23.    As Plaintiffs' loan officer and mortgage broker, Love was Plaintiffs' fiduciary as proscribed by Statute. *See* Cal. Civ. Code § 2923.1(a).

24.    As Plaintiffs' fiduciary, Love was required to "place the economic interest of the borrower ahead of his or her own economic interest." Cal. Civ. Code § 2923.1(a).

25.    Love was further obligated to provide Plaintiffs with the "highest good faith and undivided service and loyalty." *Field v. Century 21 Klowden-Forness Realty*, 63 Cal. App. 4th 18, 28 (1998).

26.    Plaintiffs, at all relevant times, provided Love with all documents and financial information requested for the purpose of brokering the mortgage for Plaintiffs' purchase of a new residence.

27.    On August 2nd, 2024, Plaintiffs submitted an offer for the purchase of the property located at 33204 Embassy Avenue, Temecula, CA 92592 ("**Embassy Residence**").

28.    Included in this offer was a Pre-Approval Letter executed by Love representing that Plaintiffs qualified for the purchase of the Embassy Residence with the terms of a $1,075,000.00 purchase price and a $125,000.00 down payment for the Embassy Residence.

29.    Prior to the submission of the offer on the Embassy Residence, Love represented to Plaintiffs that the interest rate on the mortgage would be approximately 6.125%, inclusive of all lending needs for Plaintiffs' purchase of their replacement residence.

5

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

30. Plaintiffs materially relied on CCM and Love's lending terms in submitting their offer for the purchase of the Embassy Residence. Plaintiffs were ready, willing, and able to utilize a portion of their 401K account to complete the purchase for the Embassy Residence.

31. Plaintiffs had provided CCM and Love with the requisite documentation for proof of funds available in Plaintiffs' 401K account. As Plaintiffs' fiduciary, Love had both access to Plaintiffs' financial information and was required to act with the utmost loyalty as Plaintiffs' loan officer and mortgage broker.

32. Shortly after submitting the offer for the Embassy Residence, Plaintiffs were informed that their realtor, Mr. Gormely, had failed to include a contingency requirement on Plaintiffs' sale of their current residence—despite Plaintiffs' express instructions for Mr. Gormley to include a contingency requirement that Plaintiffs must obtain a replacement residence before closing the sale of their current residence. Therefore, Plaintiffs' current residence would be sold to third party buyers, irrespective of whether Plaintiffs' purchase of the Embassy Residence was completed.

33. Plaintiffs were put into a position necessitating that Plaintiffs complete their purchase of the Embassy Residence or otherwise have no home whatsoever, leaving Plaintiffs and their children out on the street.

34. Love and CCM knew of the drastic circumstances Plaintiffs were subject to and leveraged Plaintiffs' circumstances to their own benefit.

35. Love and CCM were aware of the additional funds available to Plaintiffs, namely, the 401K account that Plaintiffs did not wish to overleverage due to the negative tax implications involved. Plaintiffs originally disclosed the 401K account to Love and CCM with the intention that Plaintiffs would use only a small portion of their funds in the 401K for the purchase of the Embassy Residence.

36. On or about September 20th, 2024, less than two weeks before the close of escrow on the Embassy Residence, CCM and Love recanted their Pre-Approval Letter and earlier assurances of financial qualifications.

6

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

37. Love's explanation for repudiating the previous approval was that Plaintiffs "no longer qualified" for the loan terms; nevertheless, Plaintiffs' financial position had not changed in the slightest from Love's original approval letter.

38. Plaintiffs had meticulously ensured that there were no changes in their financial position since Love and CCM's first Approval Letter. As instructed by Love, Plaintiffs did not incur any additional financial liabilities and only made minimum payments on their outstanding debts.

39. Unilaterally and without a reasonable basis, Love and CCM dramatically altered the terms of the lending requirements for Plaintiffs' purchase of the Embassy Residence.

40. As opposed to having only one mortgage, Love informed Plaintiffs that CCM would require Plaintiffs to obtain a second mortgage for the illogical reason of paying off all of Plaintiffs' financial liabilities to third parties.

41. Love further informed Plaintiffs that Plaintiffs were required to put more cash down to complete their purchase of the Embassy Residence, specifically instructing Plaintiffs to pull out all funds from their 401K.

42. At no point prior to Plaintiffs' signing of the final closing documents did Love nor CCM inform Plaintiffs of the actual interest rate associated with the "necessary" second mortgage. Instead, Love went back and forth with Plaintiffs, quoting Plaintiffs that the second mortgage would be a fixed interest rate at the same 6.125%, then stating that it would be a Home Equity Line of Credit ("**HELOC**") with a variable interest rate, then stating that it would be a fixed interest rate at 12%, and that after the purchase, Love and CCM would immediately refinance the second mortgage to a lower interest rate.

/ / /

/ / /

/ / /

/ / /

7

**COMPLAINT FOR DAMAGES**

43.  Love repeatedly represented contradictory and confusing loan terms to Plaintiffs concerning the second mortgage. Ultimately, Love informed Plaintiffs that the only way Plaintiffs would be able to complete the purchase—and not be homeless with their children—would be to accept whatever terms Love gave them. Love would routinely state to Plaintiffs: "this is the only way it's going to get done."

44.  At no point prior to Plaintiffs' signing of the final closing documents did Love nor CCM inform Plaintiffs of the down payment amount required for Plaintiffs to complete the purchase of the Embassy Residence.

45.  By exploiting Plaintiffs' vulnerabilities, disadvantages, and lack of sophistication in the process, while knowing of Plaintiffs' access to additional funds, CCM and Love unilaterally required Plaintiffs obtain not one but two mortgages with CCM, pay off all other outstanding debts, agree to a near-12% interest rate on a second mortgage, and put forth cash to close in a stated amount of $250,317.83—double the previous pre-approval that Plaintiffs had relied upon in originally submitting the offer for the Embassy Residence.

46.  Plaintiffs executed the final closing documents on October 1st, 2024. CCM initially provided Plaintiffs with a final loan "Closing Disclosure" at approximately 2:00 p.m. which provided an interest rate for the first mortgage at 6.125% and necessary cash to close in the exorbitant amount of $250,317.83. Only after requiring Plaintiffs to execute the "Closing Disclosure" on the first mortgage did CCM provide Plaintiffs with the "Closing Disclosure" for the second mortgage at approximately 4:00 p.m. The Closing Disclosure for the second mortgage provided an exorbitant interest rate of 11.25%.

47.  Plaintiffs were infuriated and shocked to see that the second mortgage was set at an interest rate of 11.25%.

///

///

///

8
**COMPLAINT FOR DAMAGES**

48.     Sitting there and reviewing the final documents for closing escrow on the Embassy Residence, following weeks of stress and worry on whether or not Plaintiffs and their kids would have to sleep in their car, Plaintiffs were left with no meaningful option as Plaintiffs were either going to be homeless with their children or be coerced into signing off on unconscionable, unilateral, and unnecessary financing terms.

49.     Relying on the representations of Love and CCM, Plaintiffs understood that Love and CCM would immediately refinance the second mortgage to a lower interest rate—that the 11.25% interest rate was only an interim loan to finalize the purchase of the Embassy Residence.

50.     Love and CCM further instructed Plaintiffs that the second mortgage was necessary to pay off other credit liabilities, including liabilities that had a lower interest rate than the second mortgage.

51.     Effectively, CCM and Love required Plaintiffs to pay off third party-liabilities to pay the interest on those liabilities directly to CCM—as opposed to paying the interest to the third parties who originally credited funds to Plaintiffs.

52.     A major issue with this financing arrangement was that the third-party liabilities Plaintiffs were to pay off did not exceed $100,000.00; nevertheless, Plaintiffs were required to contribute an additional $136,000.00 for the requisite "cash to close" on top of the initial down payment of $125,000.00.

53.     Plaintiffs could have merely used their own funds to pay off their liabilities and would have been in a better position than having the current 11.25% loan hanging over their heads, in addition to the unnecessary loan costs on the second mortgage for $5,163.26.

54.     Ultimately, Plaintiffs were required to pull out more than $200,000.00 from their 401K account for the required cash to close, causing substantial tax implications for the early withdrawal.

/ / /

/ / /

9

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

55. After execution of the closing documents, Love and CCM never refinanced the second mortgage or otherwise provided Plaintiffs with a lower interest rate on the second mortgage.

56. Defendants' misconduct did not end with the coerced second mortgage and additional funding requirements.

**B. SPS's Mismanagement and Misappropriation of Plaintiffs' Funds**

57. Defendants continued to cause substantial heartache and financial distress to Plaintiffs through servicing of the two mortgages.

58. For avoidance of ambiguity, CCM directly serviced the first mortgage with the initial principal amount of $802,650.00 at 6.125% ("**CCM Account**") while SPS serviced the second mortgage with the initial principal amount of $157,000.00 with an interest rate of 11.25% ("**SPS Account**").

59. For some incomprehensible reason, SPS opened an unauthorized escrow account, absconding with certain escrow funds after closing. At the same time, the CCM Account maintained the appropriate escrow account for all tax and insurance liabilities for the purchased Embassy Residence.

60. After learning of SPS's unauthorized escrow account, Plaintiffs repeatedly requested information on why SPS had opened the account or continued to contribute funds into the unauthorized escrow account for the second mortgage.

61. For months, Plaintiffs repeatedly called SPS seeking to dissolve SPS's unauthorized escrow account and to have the funds in the escrow account returned to Plaintiffs. At the same time, Plaintiffs were required to contribute additional funds they did not owe toward the unauthorized escrow account in order to stay current on the SPS Account.

/ / /

/ / /

/ / /

/ / /

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

62. After months of headache and repeated calls by Plaintiffs, SPS inevitably admitted their negligence in maintaining an unauthorized escrow account with the second mortgage for the property; nonetheless, SPS applied the funds "to the end of the mortgage" rather than reimbursing Plaintiffs for the improper contributions SPS made toward the escrow account.

63. At no time did SPS return the wrongfully acquired "escrow funds" to Plaintiffs despite Plaintiffs' multitude of requests and having never consented to SPS applying the funds to the end of the mortgage.

64. To this day SPS continues to wrongfully withhold these funds despite multiple demands by Plaintiffs to reimburse them for the wrongfully withheld funds.

65. Due to SPS's misappropriation of Plaintiffs' funds, Plaintiffs' escrow account on the CCM Account held a negative balance, requiring Plaintiffs to pay more towards their monthly payments to "catch up" with the negative escrow account. Specifically, Plaintiffs' monthly mortgage payment has increased by $605.00 per month to pay the "shortage" on the escrow account.

66. SPS claims, without any documentation, that SPS made an insurance payment totaling $2,986.12 for requisite hazard insurance on Plaintiffs' Embassy Residence. SPS was never the first mortgage on the Embassy Residence and was at no time responsible for making any payments for insurance.

67. Plaintiffs' hazard insurance company, Mercury Casualty Insurance Company, informed Plaintiffs that CCM, and not SPS, provided payment for the insurance, even producing the check for the payment made by CCM.

68. Upon information and belief, SPS is claiming the $2,986.12 payment as a credit for proceeds that were never disbursed as described, withholding $2,986.12 as a windfall benefit and to Plaintiffs' detriment.

/ / /

/ / /

/ / /

11
**COMPLAINT FOR DAMAGES**

69.    After SPS admitted to wrongfully creating the unauthorized escrow account, and then unilaterally applied the funds "to the end" of Plaintiffs' mortgage, SPS thereafter required Plaintiffs to pay an additional $150.00 per month to account for "a negative escrow balance" which Plaintiffs have since paid month over month.

70.    Just recently, as of February 23rd, 2026, SPS illogically increased the "required" monthly escrow payments by an additional $107.00, causing the Plaintiffs to pay a total of $712.00 per month for an unauthorized escrow account that SPS was never meant to have.

71.    In May of 2025, Plaintiffs made the ordinary monthly payment to SPS in the amount of $1,674.84. Plaintiffs' method of payment to SPS for the month of May 2025 was consistent with Plaintiffs' previous methods of payments to SPS. Later that month, Plaintiffs recognized that SPS never credited the monthly payment to the SPS Account. Plaintiffs repeatedly called SPS to address the discrepancy and SPS denied ever receiving the payment from Plaintiffs.

72.    Plaintiffs specifically provided SPS with proof of payment including evidence from Plaintiffs' financial account clearly illustrating the transfer of funds from Plaintiffs' account to SPS.

73.    After approximately a dozen phone calls and communications with SPS representatives, SPS finally acknowledged that SPS "misplaced" Plaintiffs' May 2025 payment. SPS never rectified their outright theft of Plaintiffs' May 2025 payment and never returned the funds to Plaintiffs despite Plaintiffs keeping their account current at all times.

74.    Due to SPS's failure to properly account for Plaintiffs' May 2025 payment, SPS marked Plaintiffs' SPS Account as delinquent, falsely reporting Plaintiffs' "default" to the Credit Reporting Agencies including TransUnion, Experian, and Equifax.

/ / /

/ / /

12

**COMPLAINT FOR DAMAGES**

75. SPS reported the "default" to the Credit Reporting Agencies in or about June of 2025—after already acknowledging SPS's mistake and mismanagement of Plaintiffs' payment.

76. In the meantime, Plaintiffs are struggling to make ends meet after being coerced out of all of their available funds and Defendants' repeated faults in managing Plaintiffs' mortgages. Defendants, nonetheless, continue to apply late fees and require additional, unfounded, payments toward Plaintiffs' escrow account.

77. After May of 2025, Plaintiffs start manually making payments on both mortgages—following Defendants' blatant theft of Plaintiffs' prior payment. For several months, Plaintiffs continue to make monthly payments manually, without any automatic payments being processed or credited from Plaintiffs' bank account.

78. SPS's represented policy for automatic payments is that SPS will stop processing automatic payments as soon as the first automated payment fails to process. The May 2025 payment failed to process as it was not credited to Plaintiffs' SPS Account. Under SPS's own policy, no further automatic payments should process through Plaintiffs' bank accounts.

79. SPS did not process any automated payments for Plaintiffs between the months of May 2025 until August 2025.

80. Plaintiffs relied on SPS's policies and SPS's lack of processing automatic payments from Plaintiffs' account in manually making their monthly payments and in believing that SPS would no longer process any further automatic payments.

81. On August 29th, 2025, without any notice, authorization, or consent by Plaintiffs, SPS initiated an automatic withdrawal of Plaintiffs' funds for a purported monthly payment.

82. This withdrawal on August 29th, 2025, was an unsolicited and unnoticed withdrawal of Plaintiffs' funds without the consent or authorization by Plaintiffs at any time.

/ / /

13
**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

83. After another round of a multitude of communications between Plaintiffs and SPS, SPS eventually refunds the withdrawal of the automatic payment. During these same communications, Plaintiffs specifically instruct SPS to not process any further automated payments.

84. Almost immediately thereafter, SPS makes yet another unauthorized and unnoticed automated withdrawal on Plaintiffs' account—within a month of Plaintiffs specifically instructing SPS to stop all future automatic payments.

85. SPS refused to return the second automatic payment despite withdrawing the funds from Plaintiffs' account without Plaintiffs' consent or authorization.

86. On January 13th, 2026, when Plaintiffs were checking their SPS Account, SPS reported to Plaintiffs that the SPS Account was delinquent since May of 2025 and that none of the payments since May of 2025 had been applied to the SPS Account.

87. Plaintiffs thereafter called SPS repeatedly, pleading to obtain information on what this new, false accounting history was evidencing. SPS refused to provide any information on the issue.

88. On or about January 14th, 2026, SPS issued letter to Plaintiffs stating: "We would like to speak with you to discuss your delinquent mortgage loan" and "[t]here are options available to help resolve the default and avoid foreclosure."

89. Plaintiffs understood the January 14th, 2026, letter to mean that SPS and CCM would seek foreclosure on Plaintiffs' property unless Plaintiffs immediately repaid all monthly payments going back to May of 2025, amounting to roughly $15,000.00.

90. On January 15th, 2026, Plaintiffs again called SPS when they were informed that SPS had reversed all payments since May of 2025, totaling $15,073.56, placing all of these payments by Plaintiffs into a "suspense account."

91. Plaintiffs' January 2026 SPS statement illustrated a nine (9) month delinquency despite Plaintiffs having made timely payments every month (in addition to automated payments going through without Plaintiffs' authorization or consent).

14

**COMPLAINT FOR DAMAGES**

92.     Mrs. Van Selus was so overwhelmed with the situation that she had to call off work due to the stress and anxiety of a possible foreclosure of Plaintiffs' property.

93.     After communications with the undersigned counsel, SPS eventually rescinded their report of a delinquency on the SPS Account, and did not act on their threats of foreclosure.

**C. The Negative Credit Furnishings and Plaintiffs' Credit Disputes**

94.     After acknowledging that SPS had "misplaced" Plaintiffs' monthly mortgage payment, SPS falsely furnished negative credit information to the Credit Reporting Agencies in or around June of 2025.

95.     The Credit Reporting Agencies thereafter reported the negative credit information—substantially diminishing Plaintiffs' credit worthiness—without performing the requisite investigation into the authenticity of the negative credit information furnished by SPS.

96.     The Credit Reporting Agencies, and each of them, failed to follow reasonable procedures to assure maximum possible accuracy of the information furnished by SPS and concerning Plaintiffs.

97.     SPS is not a reputable entity of sufficient credibility to permit the Credit Reporting Agencies to merely accept as true the negative credit information being furnished by SPS and concerning Plaintiffs. In fact, SPS maintains a rating of 1.1 stars with 971 reviews on Consumer Affairs[1], 1.5 stars on Google with 85 reviews[2], and has received 416 complaints in the last three years as reported by the Better Business Bureau[3]. Consumers notoriously complain of SPS providing false information and miscommunications about their mortgage accounts.

---

[1] https://www.consumeraffairs.com/finance/select_portfolio.html.
[2] https://www.google.com/maps/place/Select+Portfolio+Servicing/@40.6982451,-112.0917574,22939m/data=!3m1!1e3!4m6!3m5!1s0x87528b575b7381bf:0x96ecc8dc2e8ca52a!8m2!3d40.7017291!4d-111.9469942!16s%2Fg%2F11hdz87nc2?entry=ttu&g_ep=EgoyMDI2MDQxMi4wIKXMDSoASAFQAw%3D%3D
[3] https://www.bbb.org/us/ut/salt-lake-city/profile/mortgage-broker/select-portfolio-servicing-inc-1166-2003108/complaints

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

98.    Upon information and belief, SPS routinely furnishes incorrect negative credit information to the Credit Reporting Agencies—to which the Credit Reporting Agencies routinely correct after the fact.

99.    Upon information and belief, the Credit Reporting Agencies are knowledgeable that SPS is not a reputable furnisher of accurate credit information.

100.    The Credit Reporting Agencies, and each of them, failed to follow reasonable procedures to authenticate the credit information furnished by SPS before reporting the negative credit information on Plaintiffs' consumer credit reports.

101.    Due to the delinquency appearing on Plaintiffs' credit reports, Plaintiffs' credit worthiness immediately took a nosedive.

102.    Following the false and negative credit reports, Plaintiffs suddenly received a multitude of notices stating that Plaintiffs' credit lines had been revoked or substantially reduced in response to Plaintiffs' current credit report.

103.    Mr. Henderson lost approximately $100,000.00 worth of credit on his credit lines while Mrs. Van Selus lost approximately $70,000.00 on her credit lines.

104.    Mrs. Van Selus runs a children's clothing boutique that relies on lines of credit to purchase materials for the business to then tailor and sell clothing. When Mrs. Van Selus's credit lines were diminished, Mrs. Van Selus was unable to purchase the same volume of materials due to her diminished credit. Thereof, the revenue generated by her business has drastically decreased.

105.    Mr. Henderson attempted to refinance the second mortgage to be rid of the flagrant mismanagement of SPS and to obtain a lower interest rate. Mr. Henderson's attempts to refinance were to no avail after SPS falsely furnished the negative credit information to the Credit Reporting Agencies.

106.    At the same time, Plaintiffs hoped to finance the purchase of a vehicle to drive their children around with as their prior vehicle was proven to be unsafe to drive. Plaintiffs were denied financing opportunities for the new vehicle.

/ / /

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

107. In the employment context, Mr. Henderson immediately became fearful that he would be subject to suspension, have his license revoked by FINRA, and even fired from his position as a financial advisor. Mr. Henderson's financial position is extremely important for Mr. Henderson to maintain his job and manage nearly $100 million in assets for his clients.

108. Mr. Henderson diligently disputed the negative credit information with Equifax and TransUnion. At the same time, Mrs. Van Selus disputed the negative credit information with Equifax.

109. Equifax and TransUnion provided summarily the same response to Plaintiffs' credit disputes: "the creditor has verified the accuracy of the prior payment history." While the delinquency was thereafter removed from Plaintiffs' credit reports, the domino effect on Plaintiffs' other credit lines was irreversible.

110. Equifax and TransUnion did not provide notice to Plaintiffs that Plaintiffs' dispute was "frivolous or irrelevant" pursuant to 15 U.S.C. § 1681i(a)(3).

111. Equifax and TransUnion's investigations into the disputed consumer information were unreasonable. Specifically, Equifax and TransUnion should have discovered from their own records, including Plaintiffs' formal disputes, that the information being reported was inaccurate and materially misleading since Plaintiffs provided information demonstrating that they were current on payments with their SPS Account.

112. Equifax and TransUnion failed to contact Plaintiffs for further information if needed to validate the authenticity of their dispute.

113. The unreasonableness of these investigations is further established by the fact that Equifax and TransUnion later stopped reporting the late payment on Plaintiffs' SPS Account, despite initially responding to Plaintiffs' dispute that the information was accurate.

/ / /

/ / /

17

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

114. Equifax and TransUnion continued to inaccurately and negatively report information on Plaintiffs' consumer reports, irrespective of Plaintiffs' disputes and information provided.

115. Accordingly, Equifax and TransUnion willfully and negligently failed to comply with their respective obligations under the FCRA to reasonably investigate Plaintiffs' disputes.

116. Upon information and belief, the Credit Reporting Agencies, and each of them, stopped reporting the delinquency on Plaintiffs' SPS Account in or about September of 2025.

117. Over the past year and a half of dealing with this situation, Plaintiffs have felt immense strain in navigating this landscape of fraud, theft, false credit reporting, and extreme financial difficulty. Mr. Henderson describes the situation akin to a nail being repeatedly beaten into a piece of wood over and over and over again, where the nail is already so deep into the wood that it cannot go any further. Mrs. Van Selus describes the situation as if she has been drowning for over a year, unable to breathe and lacking even a single day of peace. Plaintiffs wake up in the morning terrified that Defendants are going to do something else to again cause extreme hardship and duress for Plaintiffs. Plaintiffs are fearful of being unable to put food on the table for their kids should SPS again "lose a payment" or require several months of "lost payments" with the looming threat of foreclosure. Plaintiffs have even half-heartedly joked with each other that "if we just drove ourselves off a cliff, at least all of this would be over."

### FIRST CAUSE OF ACTION

### Violations of The Truth in Lending Act (TILA) | 15 U.S.C. § 1601 *et seq.*

### (Against CCM)

118. Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

/ / /

18

**COMPLAINT FOR DAMAGES**

119.   The Truth in Lending Act (**"TILA"**), codified as 15 U.S.C. § 1601, *et seq.*, was enacted by Congress in 1968 to promote the informed use of consumer credit through meaningful disclosure of credit terms. Its primary purpose is to ensure that consumers can compare various credit terms more readily and avoid the uninformed use of credit. The TILA further aims to protect consumers from inaccurate and unfair credit billing and credit card practices. *Pacific Shore Funding v. Lozo*, 138 Cal. App. 4th 1342 (2006); *Thompson v. 10,000 RV Sales, Inc.*, 130 Cal. App. 4th (2005).

120.   To achieve these goals, the TILA delegates regulatory authority to the Federal Reserve Board to issue regulations, known as Regulation Z, which implement the Act's provisions and ensure its effectiveness. *Bone v. Hibernia Bank*, 493 F. 2d 135, 138 (9th Cir. 1974). "Only adherence to the strict compliance standard will promote standardization of terms which will permit consumers readily to make meaningful comparisons of available credit alternatives." *Smith v. Chapman*, 619 F. 2d 968, 971 (9th Cir. 1980).

121.   The TILA requires a lender to timely disclose, among other things, the amount financed, the finance charge, and the APR. 15 USC § 1638. Regulation Z sets out certain guidelines for creditors to follow when disclosing the information to the consumer. 12 C.F.R. §§ 226.18; 12 C.F.R. § 226.22. Regulation Z defines "APR" as "a measure of the cost of credit, expressed as a yearly rate, that relates the amount and timing of value received by the consumer to the amount and timing of payments made." 12 C.F.R. § 226.22(a)(1). As "the single most useful disclosure mandated by the Act," the APR "is a derived figure, calculated from (i) the amount of the finance charge, (ii) the amount of credit extended, and (iii) the term of the extension of credit—the time period between the date interest starts accruing and the date of the last payment." *Krenisky v. Rollins Protective Services Co.* 728 F. 2d 64, 66 (2nd Cir. 1984). Under the TILA and Regulation Z, the disclosed APR must be accurate to within 0.125 percent of the properly calculated APR. 15 U.S.C. § 1606(c); 12 C.F.R. § 226.222(a)(2).

/ / /

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

19

**COMPLAINT FOR DAMAGES**

122. A violation of the TILA occurs when a creditor fails to comply with the disclosure requirements or engages in practices that undermine the Act's purpose of ensuring informed consumer credit use. Violations can be substantive or technical, and even a single violation can extend a borrower's right to rescind the transaction. *Pacific Shore Funding v. Lozo*, 138 Cal. App. 4th 1342 (2006). Failing to disclose the APR accurately to a consumer in a reasonable time and within 0.125% of the properly calculated rate constitutes a violation of the TILA. *Nelson v. Pearson Ford Co.*, 186 Cal. App. 4th 983 (2010). Other violations include failing to provide clear and conspicuous disclosures about the right to rescind a transaction, the finance charge, or other material terms of the credit agreement. *Pacific, supra,* at 1349.

123. Courts "require absolute compliance by creditors [and] even technical or minor violations of the TILA impose liability on the creditor." *Rubio v. Capital One Bank* (201) 613 F. 3d 1195, 1199.)

124. Regulation Z establishes that "the creditor shall make disclosures before consummation of the transaction." 12 C.F.R. § 226.17. For closed-end home mortgages, the "creditor shall furnish the disclosures required by § 226.32 at least three business days prior to consummation of a mortgage transaction covered by § 226.32." 12 C.F.R. § 226.31(c). Closed-end home mortgages, as defined by 12 C.F.R. § 226.32, are "a consumer credit transaction that is secured by the consumer's principal dwelling, and in which . . . [t]he annual percentage rate at consummation will exceed . . . more than 10 percentage points for subordinate-lien loans[.]"

125. Violations of the TILA provide for remedies to the consumer of up to $4,000.00 in statutory damages as well as recovery of reasonable attorneys' fees and the costs of the action. 15 U.S.C. § 1640(a).

126. Plaintiffs entered into a "closed-end home mortgage" with CCM as that term is defined by Title 12 of the Code of Federal Regulations, Section 226.32(a).

127. CCM violated the TILA by failing to provide Plaintiffs with timely and accurate material disclosures required under the TILA and Regulation Z.

20

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

128. CCM failed to provide material disclosures to Plaintiffs, at least three business days prior to the consummation of the mortgage, in violation of 15 U.S.C. 1639, by failing to disclose the amount of the finance charge, accurate annual percentage rate, length of the loan, and whether or not the monthly payment would be fixed or change over time.

129. CCM and Love failed to offer Plaintiffs other loan products that could have been more advantageous for the Plaintiffs under the same qualifying matrix, including but not limited to Plaintiffs' ability to directly pay off their existing financial liabilities owed to third parties.

130. CCM and Love failed to provide Plaintiffs with any other alternative loan products.

131. As a direct and proximate result of CCM and Love's conduct, Plaintiffs were subject to extremely harsh financing terms, tax liabilities associated with the high down-payment to complete the purchase on the Embassy Residence, emotional distress, and loan origination costs for the closed-end home mortgage.

132. A controversy now exists between Plaintiffs and CCM, granting Plaintiffs the right to rescind and/or reform the loan on the subject property.

133. CCM is further liable for statutory damages and reasonable attorneys' fees and costs incurred as provided for under the TILA.

134. CCM's actions in this matter were willful, knowing, malicious, fraudulent, and oppressive, entitling Plaintiffs to punitive damages in an amount to be determined at trial.

**SECOND CAUSE OF ACTION**

**Violations of the Real Estate Settlement Procedures Act (RESPA)**

**(Against SPS)**

135. Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

21

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

136. Congress enacted the Real Estate Settlement Procedures Act ("**RESPA**") in 1974 to "insure that consumers throughout the [n]ation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices . . . ." *Washington Mut. Bank, FA v. Superior* Court, 75 Cal. App. 4th 773, 779 (1999) *citing* 12 U.S.C. 2601.

137. "RESPA applies not only to the actual settlement process, however, but also to the servicing of federally related mortgage loans." *Tamburri v. Suntrust Mortg., Inc.*, 875 F. Supp. 2d 1009, 1012 (N.D. Cal. 2012).

138. Under RESPA, mortgage servicers are expressly prohibited from "fail[ing] to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties[.]" 12 U.S.C. § 2605.

139. A mortgage servicer under RESPA is required to appropriately manage the escrow account on behalf of the borrower, including proper accounting of timely payments and to return to the borrower within 20 business days any unused escrow funds. 12 U.S.C. § 2605(g).

140. RESPA provides for actual damages in addition to statutory damages of $2,000.00 per individual plaintiff for a defendant's violations of RESPA. 12 U.S.C. 2605(f). RESPA further provides for recovery of reasonable attorneys' fees and costs incurred in connection with such action. *Id.*

141. SPS is a "servicer" as that term is defined under Title 12 of the United States Code Section 2605(i)(2).

142. Plaintiffs, and each of them, repeatedly reported errors existing and occurring with their SPS Account from approximately January 2025 through December 2025. These existing and reoccurring, reported errors included SPS maintaining an unauthorized escrow account, charging Plaintiffs an unauthorized monthly escrow payment, failing to credit Plaintiffs for their monthly payment in the month of May

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

22

**COMPLAINT FOR DAMAGES**

2025, losing Plaintiffs' monthly payment made in the month of May 2025, and repeatedly charging Plaintiffs automatic payments after Plaintiffs instructed SPS to stop all automatic payments.

143. SPS violated RESPA by failing and/or refusing to take timely action to respond to Plaintiffs' requests to correct the errors related to the SPS Account, failing to update Plaintiffs' account balances, failing and/or refusing to return to Plaintiffs the funds in SPS's unauthorized escrow account, failing and/or refusing to cancel and return automatic payment transactions that Plaintiffs did not consent to, and continuing to charge Plaintiffs with monthly escrow fees when SPS should have never had an escrow account in the first place.

144. Plaintiffs suffered damages as a direct and proximate result of SPS's violations of RESPA, including but not limited to monetary damages, conversion of their financial assets, opportunity costs, and emotional distress damages.

145. SPS is further liable for statutory damages and reasonable attorneys' fees and costs incurred and as permitted pursuant to RESPA.

146. SPS's actions in this matter were willful, knowing, malicious, fraudulent, and oppressive, entitling Plaintiffs to punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### Fraudulent Misrepresentation | Cal. Civ. Code § 1709

### (Against CCM and Love)

147. Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

148. "An action for [] fraud may lie where a defendant fraudulently induces the plaintiff to enter into a [written] contract. In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract." *Austin v. Medicis*, 21 Cal. App. 5th 577, 588 (2018).

23

**COMPLAINT FOR DAMAGES**

149. "[T]here are two causation elements in a fraud cause of action. First, the plaintiff's actual and justifiable reliance on the defendant's misrepresentation must have caused him to take a detrimental course of action. Second, the detrimental action taken by the plaintiff must have caused his alleged damage." *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1059-1060 (2012).

150. California Civil Code Section 1709 provides: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

151. California Civil Code Section 1710 provides four different circumstances that each amount to a claim of fraud:

1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

4. A promise, made without any intention of performing it.

152. In order to establish a cause of action for fraud, a plaintiff must plead and prove all the elements of fraud, namely: (1) misrepresentation; (2) knowledge of falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damages. *Conrad v. Bank of America*, 45 Cal. App. 4th 133, 156 (1996).

153. Defendants CCM and Love originally represented to Plaintiffs that Plaintiffs qualified for their purchase of the Embassy Residence through a single mortgage with CCM, under the loan terms of a 6.125% interest rate, with a principal balance of $802,650.00, and a requisite down payment of $125,000.00.

154. Plaintiffs relied on CCM and Love's representation when they submitted their offer on the Embassy Residence.

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

155.   Merely two weeks away from closing on the Embassy Residence, CCM and Love materially and unilaterally changed the terms of the loan requirements for Plaintiffs "to be able to qualify" for their purchase of their Embassy Residence.

156.   CCM and Love only altered the terms of Plaintiffs' loan requirements after being informed that Plaintiffs required their purchase of the Embassy Residence to proceed or otherwise Plaintiffs and their children would have no place to live.

157.   CCM and Love leveraged Plaintiffs' dire circumstances when they falsely represented to Plaintiffs that Plaintiffs would require not one, but two loans with CCM, with the second loan at an exorbitant interest rate and requiring more than double the requisite cash to close as initially promised.

158.   Love and CCM expressly repeated to Plaintiffs that "this is the only way it's going to get done" when seeking to force Plaintiffs to accept the second mortgage agreement.

159.   Love and CCM further represented to Plaintiffs that Love and CCM would quickly refinance the second mortgage to obtain a lower interest rate for Plaintiffs after finalizing the purchase on the Embassy Residence.

160.   At the time of making their representations, Love and CCM knew that their representations were false, misleading, and/or deceptive.

161.   Love and CCM intentionally made their false representations for the purpose of inducing Plaintiffs into accepting the unfair and harmful financing terms.

162.   Love and CCM would make these false representations repeatedly and consistently between the dates of August 2024 and October 1st, 2024, through means of text messages, verbal telephonic communications, and video updates sent by Love to Plaintiffs.

163.   At the time of making their promises, CCM and Love had no intention of performing the services promised.

/ / /

/ / /

25

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

164. Plaintiffs reasonably relied on the representations by CCM and Love when agreeing to the terms of the loan and executing the requisite loan documents when signing for closing on the Embassy Residence.

165. Plaintiffs reasonably relied upon CCM and Love's representations as set forth above, because Plaintiffs believed CCM and Love to be reputable business professionals.

166. As a proximate result of CCM and Love's unlawful conduct, Plaintiffs were fraudulently induced into agreeing to a second mortgage for the purchase of their Embassy Residence, a second mortgage that provided Plaintiffs with effectively nothing but additional monthly payments at an exorbitant interest rate and requiring a substantially larger down deposit for their purchase. Plaintiffs suffered substantial monetary damages, emotional distress, and conversion of their financial property through an unnecessary, second mortgage loan.

167. CCM's actions in this matter were willful, knowing, malicious, fraudulent, and oppressive, entitling Plaintiffs to punitive damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION | CAL. CIV. CODE § 1709

### (Against CCM and Love)

168. Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

169. "Negligent misrepresentation is a separate and distinct tort, a species of the tort of deceit. 'Where the defendant makes false statements, honestly believing that they are true, but without reasonable ground for such belief, he may be liable for negligent misrepresentation, a form of deceit.'" *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 407-408 (1992).

/ / /

26

**COMPLAINT FOR DAMAGES**

170. "This is not merely a case where the defendants made false representations of matters within their personal knowledge which they had *no reasonable grounds for believing to be true*. Such acts clearly would constitute actual fraud under California law. In such situations the defendant *believes* the representations to be true but is without reasonable grounds for such belief. His liability is based on negligent misrepresentation which has been made a form of actionable deceit." *Yellow Creek Logging Corp v. Dare*, 216 Cal. App. 2d 50, 57 (1963).

171. "Negligent misrepresentation requires an assertion of fact, falsity of that assertion, and the tortfeasor's lack of reasonable grounds for believing the assertion to be true. It also requires the tortfeasor's intent to induce reliance, justifiable reliance by the person to whom the false assertion of fact was made, and damages to that person." *SI 59 LLC v. Variel Warner Ventures, LLC*, 29 Cal. App. 5th 146, 154 (2018).

172. Defendants CCM and Love originally represented to Plaintiffs that Plaintiffs qualified for their purchase of the Embassy Residence through a single mortgage with CCM, under the loan terms of a 6.125% interest rate, with a principal balance of $802,650.00, and a requisite down payment of $125,000.00.

173. Plaintiffs relied on CCM and Love's representation when they submitted their offer on the Embassy Residence.

174. Merely two weeks away from closing on the Embassy Residence, CCM and Love materially and unilaterally changed the terms of the loan requirements for Plaintiffs "to be able to qualify" for their purchase of their Embassy Residence.

175. CCM and Love only altered the terms of Plaintiffs' loan requirements after being informed that Plaintiffs required their purchase of the Embassy Residence to proceed or otherwise Plaintiffs and their children would have no place to stay.

176. CCM and Love leveraged Plaintiffs' dire circumstances when they falsely represented to Plaintiffs that Plaintiffs would require not one, but two loans with CCM, with the second loan at an exorbitant interest rate and requiring more than double the requisite cash to close as initially promised.

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

177.   Love and CCM expressly repeated to Plaintiffs that "this is the only way it's going to get done" when referring to forcing Plaintiffs to accept the second mortgage agreement.

178.   Love and CCM further represented to Plaintiffs that Love and CCM would quickly refinance the second mortgage to obtain a lower interest rate for Plaintiffs after finalizing the purchase on the Embassy Residence.

179.   Love and CCM would make these false representations repeatedly and consistently between the dates of August 2024 and October 1st, 2024, through means of text messages, verbal telephonic communications, and video updates sent by Love to Plaintiffs.

180.   At the time Defendants made the representations herein alleged, Defendants lacked reasonable grounds for believing that their assertions were true.

181.   Love and CCM negligently made their false representations for the purpose of inducing Plaintiffs into accepting the unfair and harmful financing terms.

182.   Plaintiffs reasonably relied on the representations by CCM and Love when agreeing to the terms of the loan and executing the requisite loan documents when signing for closing on the Embassy Residence.

183.   Plaintiffs reasonably relied upon CCM and Love's representations as set forth above, because Plaintiffs believed CCM and Love to be reputable business professionals.

184.   As a proximate result of Defendants' unlawful conduct, Plaintiffs were induced into agreeing to a second mortgage for the purchase of their Embassy Residence, a second mortgage that provided Plaintiffs with effectively nothing but additional monthly payments at an exorbitant interest rate and requiring a substantially larger down deposit for their purchase. Plaintiffs suffered substantial monetary damages, emotional distress, and conversion of their financial property through an unnecessary mortgage loan.

/ / /

28

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

**FIFTH CAUSE OF ACTION**

**Breach of Fiduciary Duty and Professional Negligence**

**(Against CCM and Love)**

185.  Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

186.  "A fiduciary relationship is any relation existing between parties to a transaction wherein one of the parties is in duty bound to act with the utmost good faith for the benefit of the other party. Such a relation ordinarily arises where a confidence is reposed by one person in the integrity of another, and in such a relation the party in whom the confidence is reposed, if he voluntarily accepts or assumes to accept the confidence, can take no advantage from his acts relating to the interest of the other party without the latter's knowledge or consent . . . . " *Wolf v. Superior* Court, 107 Cal. App. 4th 25, 29 (2003).

187.  California Civil Code Section 2923.1 imposes on a mortgage broker fiduciary obligations and "a requirement that the mortgage broker place the economic interest of the borrower ahead of his or her own economic interest." Likewise, the "mortgage broker who provides mortgage brokerage services to the borrower owes this fiduciary duty to the borrower regardless of whether the mortgage broker is acting as an agent for any other party in connection with the residential mortgage loan transaction." *Id*.

188.  "A broker has a fiduciary duty to its client." *Michel v. Moore & Associates, Inc.*, 156 Cal. App. 4th 756, 762 (2007). "[A] broker's fiduciary duty to his client requires the highest good faith and undivided service and loyalty." *Field v. Century 21 Klowden-Forness Realty*, 63 Cal. App. 4th 18, 25 (1998). "A fiduciary must tell its principal of all information it possesses that is material to the principal's interests." *Michel v. Moore & Associates, Inc.* 156 Cal. App. 4th 756, 762 (2007). A fiduciary's failure to share material information with the principal is constructive fraud, a term of

29

**COMPLAINT FOR DAMAGES**

art obviating actual fraudulent intent. Cal. Civ. Code § 1573.

189.   Defendant Love, both vicariously and jointly as CCM's employee and/or agent, agreed to be Plaintiffs' mortgage broker through Plaintiffs' offer and purchase of the Embassy Residence.

190.   As Plaintiffs' mortgage broker, Love and CCM owed fiduciary duties to Plaintiffs, requiring that they provide the highest good faith and undivided service and loyalty to Plaintiffs, and to put Plaintiffs' economic interests ahead of their own.

191.   Love and CCM breached their fiduciary duties owed to Plaintiffs when Love and CCM induced Plaintiffs into agreeing to economically harmful and unnecessary loan terms, requiring Plaintiffs to agree to a near twelve percent interest rate on a second, unnecessary mortgage, and to withdraw substantial funds from their 401K account, incur negative tax burdens, and provide nearly twice as much cash to close to purchase the Embassy Residence.

192.   Defendants' conduct was entirely inconsistent with the fiduciary duties they owed to Plaintiffs under California law.

193.   As a proximate result of Defendants CCM and Love's breach of fiduciary duties owed to Plaintiffs, Plaintiffs have suffered monetary damages in addition to emotional distress.

194.   By extorting, converting, embezzling, or otherwise unlawfully securing Plaintiffs' monetary assets, Plaintiffs were harmed.

195.   Defendants' conduct as alleged hereinabove was criminal, oppressive, malicious, willful and intended to harm and did harm Plaintiffs, warranting imposition of exemplary damages.

/ / /

/ / /

/ / /

/ / /

/ / /

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

## SIXTH CAUSE OF ACTION

### Conversion

### (Against CCM, Love, and SPS)

196. Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

197. "Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages . . . ." *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015). "It is not necessary that there be a manual taking of the property; it is only necessary to show an assumption of control or ownership over the property or that the alleged converter has applied the property to his own use . . . ." *Shopoff & Cavallo LLP v.* Hyon, 167 Cal. App. 4th 1489, 1507 (2008).

198. "[A]ny act of dominion wrongfully exerted over the personal property of another inconsistent with the owner's rights thereto constitutes conversion." (*Plummer v. Day/Eisenberg, LLP*, 184 Cal. App. 4th 38, 50 (2010).

199. "[M]istake, good faith, and due care are ordinarily immaterial, and cannot be set up as defenses in an action for conversion." *Taylor v. Forte Hotels Int'l*, 234 Cal. App. 3d 1119, 1124 (1991).

200. "[C]onversion is a strict liability tort. It does not require bad faith, knowledge, or even negligence; it requires only that the defendant intentionally done the act depriving the plaintiff of his or her rightful possession." *Voris v. Lampert*, 7 Cal. 5th 1141, 1158 (2019).

201. California Penal Code § 532 makes it a crime to acquire money or property through false pretenses.

/ / /

/ / /

31
**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

202.   Defendants CCM and Love falsely induced Plaintiffs to part with their financial property and monetary assets in the form of inducing Plaintiffs to agree to a second mortgage at an exorbitant rate of 11.25%, additional loan origination costs of $5,163.26, and contributing an additional cash to close in the stated amount of $157,000.00.

203.   Defendants CCM and Love converted Plaintiffs' assets through false pretenses and by wrongfully inducing Plaintiffs into signing an egregiously unfair loan agreement.

204.   Defendant SPS converted Plaintiffs' monetary assets in the form of withholding and refusing to return to Plaintiffs $2,986.12 which SPS falsely stated was used to pay for insurance it never actually paid for, in addition to $1,168.17 in escrow funds that SPS wrongfully withheld from Plaintiffs after acknowledging that SPS never should have maintained an escrow account.

205.   SPS converted Plaintiffs' assets by directly misappropriating Plaintiffs' funds without a legal or contractual basis to do so, without the consent or authorization from Plaintiffs, and in excess of the agreed upon mortgage payments.

206.   CCM, Love, and SPS procured Plaintiffs' financial property through false pretenses, theft, and/or conversion.

207.   Plaintiffs suffered damages as a result of CCM, Love, and SPS's conversion and theft by false pretenses of Plaintiffs' financial property and monetary assets.

208.   CCM, Love, and SPS's conduct as alleged hereinabove was criminal, oppressive, malicious, willful and intended to harm and did harm Plaintiffs, warranting imposition of exemplary damages.

/ / /

/ / /

/ / /

/ / /

32

**COMPLAINT FOR DAMAGES**

## SEVENTH CAUSE OF ACTION

### Civil Theft | Cal. Penal Code § 496(c)

### (Against CCM, Love, and SPS)

209. Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

210. California Penal Code Section 496 defines the criminal offense of receipt of stolen property, or theft. Section 496(a) states: "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained" shall be guilty of this section herein.

211. Section 496(c) permits "Any person who has been injured by a violation of subdivision (a) [to] bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

212. Section 496(c) "authorize[s] an award of treble damages whenever a plaintiff proves (or, in the case of a default, sufficiently alleges) any type of theft– whether it be fraud, misrepresentation, conversion, or breach of fiduciary duty . . . ." (*Siry Investment, L.P. v. Farkhondehpour* (2022) 13 Cal. 5th 333, 359.) Successful claims under fraud and breach of contract are sufficient to establish a claim under Penal Code Section 496(c) and to obtain treble damages therein. (*Siry Inv., L.P. v. Farkhondehpour* (2022) 13 Cal. 5th 333, 351; *Switzer v. Wood* (2019) 35 Cal. App. 5th 115, 247.)

213. "Requiring a criminal conviction under section 496(a) or 496(c) [is not required] before an injured person [can] recover treble damages" in a civil lawsuit. *Bell v. Feibush* (2013) 212 Cal. App. 4th 1041, 1047.

214. CCM, Love, and SPS received Plaintiffs' property that had been stolen or that had been obtained in a manner constituting theft and/or conversion.

/ / /

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

215. CCM, Love, and SPS had reason to know that the property had been stolen or obtained by theft and/or conversion.

216. The unlawful conduct of CCM, Love, and SPS as described herein constitutes a violation of California Penal Code Section 496.

217. Plaintiffs have been injured by Defendants' violations of California Penal Code Section 496 and are therefore entitled to "three times the amount of actual damages . . . sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

218. CCM, Love, and SPS's conduct as alleged hereinabove was criminal, oppressive, malicious, willful and intended to harm and did harm Plaintiffs, warranting imposition of exemplary damages.

## EIGHTH CAUSE OF ACTION

## Violations of The Fair Debt Collection Practices Act (FDCPA)

## (Against SPS)

219. Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

220. The United States Congress has found abundant evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors, and has determined that abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy. Congress wrote the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. ("**FDCPA**"), to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.

/ / /

/ / /

/ / /

34

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

221. The FDCPA was enacted in 1977 for the purpose of eliminating abusive debt collection practices by debt collectors, among other things. *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 575–77, 130 S. Ct. 1605, 1608, 176 L.Ed.2d 519 (2010); *Dunham v. Portfolio Recovery Associates, LLC*, 663 F.3d 997, 1000 (8th Cir. 2011). It regulates where and when a debt collector may communicate with a consumer. *See* 15 U.S.C. § 1692c.

222. The Court in *Donnelly-Tovar v. Select Portfolio Servicing, Inc.*, 945 F. Supp. 2d 1037, 1044 (D. Neb. 2013) agreed a mortgage servicing company is deemed to be debt collector even when it is pursuing a non-existent debt. As it held:

 "The definition of debt collector pursuant to § 1692a(6)(F)(iii) includes any non-originating debt holder that either acquired a debt in default or has treated the debt as if it were in default at the time of acquisition." *Bridge v. Ocwen Federal Bank, FSB*, 681 F.3d 355, 362 (6th Cir. 2012) (finding error in the district court's dismissal of a complaint against mortgage lender, assignee, and servicer for FDCPA violations). "[A] debt holder or servicer is a debt collector when it engages in collection activities on a debt that is not, as it turns out, actually owed." *Id.* (noting "[t]his stands to reason since the pursuit of collection activities presupposes that the collector alleges or asserts that the subject of those activities is obligated.").

223. Under the FDCPA, debt collectors cannot:

a. use false, deceptive, misleading, unfair or unconscionable means to collect or attempt a debt 15 U.S.C. § 1692e(10) and 1692f;

b. falsely represent the character, amount, or legal status of any debt 15 U.S.C. § 1692e(2)(A);

c. threaten to take any action that cannot legally be taken 15 U.S.C. § 1692e(5);

d. communicate or threaten to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed; 15 U.S.C. § 1692e(8); and

e. attempt to collect any amount not expressly authorized by the agreement creating the debt or permitted by law.  15 U.S.C. §1692f(1).

35

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

224.   SPS improperly attempted to collect from Plaintiffs a consumer debt which was not owed by law or by contract by: (1) requiring Plaintiffs to pay monthly payments toward an unauthorized escrow account; (2) holding Plaintiffs' SPS Account in delinquency after SPS had lost Plaintiffs' May 2025 monthly mortgage payment; (3) repeatedly and consistently informing Plaintiffs that their SPS Account was delinquent due to SPS mishandling and losing Plaintiffs' May 2025 monthly mortgage payment; (4) increasing Plaintiffs' monthly escrow payment after SPS acknowledged and agreed that SPS should never have maintained an escrow account as the second mortgage on Plaintiffs' residence; (5) threatening to foreclose on Plaintiffs' residence due to SPS's fraudulent representation of Plaintiffs' account being more than five months delinquent; and (6) furnishing false negative credit information to the Credit Reporting Agencies when SPS knew and acknowledged that Plaintiffs had made all requisite payments to the SPS account.

225.   SPS's attempt to collect upon a debt from Plaintiffs was harassing, improper, and invalid. SPS sought to collect more than what was due by Plaintiffs under the terms of the mortgage between the Parties.

226.   SPS's conduct as alleged herein constitutes willful and intentional violations of the FDCPA.

227.   As a direct and proximate result of the wrongful acts of SPS, Plaintiffs have suffered from anxiety, worry, embarrassment, humiliation, mental anguish, and emotional distress. Plaintiffs have experienced emotional and mental symptoms caused by the wrongful acts of SPS. Plaintiffs have suffered past, present, and future damages in an amount to be determined according to proof at the time of trial.

228.   SPS conduct as stated herein violated the FDCPA under the following sections: §§ 1692e(1), 1692e(2), 1692e(4), 1692e(5), 1692e(8), 1692e(10), 1692f(1), and 1692f(6).

/ / /

/ / /

36

**COMPLAINT FOR DAMAGES**

229. As a result of SPS's violations of the FDCPA, Plaintiffs are entitled to statutory damages in an amount of up to $1,000.00 pursuant to 15 U.S.C. § 1692k(a)(2)(A); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1692k(a)(3), from SPS herein.

### NINTH CAUSE OF ACTION

### Violations of the Rosenthal Fair Debt Collection Practices Act

### (Against SPS)

230. Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

231. The Rosenthal Act was enacted "to prohibit debt collectors from engaging in unfair or deceptive acts or practices in the collection of consumer debts." Cal. Civ. Code § 1788.1(b); *Davidson v. Seterus, Inc.*, 21 Cal. App. 5th 283, 295 (2018). The Rosenthal Act is "a remedial statute [that] should be interpreted broadly in order to effectuate its purpose." *Komarova v. National Credit Acceptance, Inc.*, 175 Cal. App. 4th 324, 340 (2009). The Rosenthal Act generally requires debt collectors to comply with the provisions of the FDCPA. Cal. Civ. Code § 1788.17.

232. Under the act, a "debt collector" is defined as "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection." Cal. Civ. Code § 1788.2(c).

233. "Debt collection" is defined as: "any act or practice in connection with the collection of covered debts." Cal. Civ. Code § 1788.2(b).

234. "Consumer debt" and "consumer credit" are defined as "money, property, or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction." Cal. Civ. Code § 1788.2(f).

235. "[M]ortgage debt has been held to constitute consumer debt, the collection of which may be governed by the FDCPA [and by extension, the RFDCPA]." *Davidson v. Seterus, Inc.*, 21 Cal. App. 5th 283, 298 (2018). "We therefore conclude that the

37

**COMPLAINT FOR DAMAGES**

Rosenthal Act's definition of 'debt collector' applies to a mortgage servicer who engages in debt collection practices in attempting to obtain repayment of mortgage debt, and that the trial court improperly sustained defendants' demurrer on the ground that the Rosenthal Act does not apply to mortgage servicers." *Id* at 304.

236. A "consumer credit transaction" is defined as: "a transaction between a natural person and another person in which property, services, or money is acquired on credit by that natural person from the other person primarily for personal, family, or household purposes." Cal. Civ. Code § 1788.2(e). The "ordinary and usual meaning of the phrase 'on credit' can be stated as obtaining something of value without immediate payment on the promise to make a payment or payments in the future." *Davidson v. Seterus, Inc.*, 21 Cal. App. 5th 283, 295 (2018).

237. "[T]hreats to foreclosure [] is precisely the type of conduct that the Legislature wanted to protect consumers against when it enacted the Rosenthal Act." *Davidson v. Seterus, Inc.*, 21 Cal. App. 5th 283, 295 (2018); *see also* Sen. Com. On Judiciary, Re. on Sen. Bill No. 237 (1977-1978 Reg. Sess.), as amended May 11, 1977 ["This bill would prohibit any person from engaging in certain debt collection practices" including a "list of prohibited threatening, abusive and deceptive practices"].)

238. "No debt collector shall collect or attempt to collect a covered debt by means of the following conduct: [] (e) The threat to any person that nonpayment of the consumer debt may result in . . . the seizure, garnishment, attachment or sale of any property . . . ." Cal. Civ. Code § 1788.10(e). It is further prohibited for a debt collector to falsely represent "that a legal proceeding has been, is about to be, or will be instituted unless payment of a covered debt is made." Cal. Civ. Code § 1788.13(j). The FDCPA similarly prohibits the "false representation of—(A) the character, amount, or legal status of any debt; or (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

239. The Rosenthal Act provides for statutory attorneys' fees and costs, statutory damages of $1,000.00, and actual damages sustained by a debt as a result of

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

38

**COMPLAINT FOR DAMAGES**

the debt collectors' violations of the Act. Cal. Civ. Code § 1788.30. "Any waiver of the provisions of this title is contrary to public policy, and is void and unenforceable." Cal. Civ. Code § 1788.33.

240. SPS is a debt collector that was attempting to collect on a consumer debt from Plaintiffs, e.g., Plaintiffs' mortgage with SPS.

241. SPS improperly attempted to collect from Plaintiffs a consumer debt which was not owed by law or by contract by: (1) requiring Plaintiffs to pay monthly payments toward an unauthorized escrow account; (2) holding Plaintiffs' SPS Account in delinquency after SPS had lost Plaintiffs' May 2025 monthly mortgage payment; (3) repeatedly and consistently informing Plaintiffs that their SPS Account was delinquent due to SPS mishandling and losing Plaintiffs' May 2025 monthly mortgage payment; (4) increasing Plaintiffs' monthly escrow payment after SPS acknowledged and agreed that SPS should never have maintained an escrow account as the second mortgage on Plaintiffs' residence; (5) threatening to foreclose on Plaintiffs' residence due to SPS's fraudulent representation of Plaintiffs' account being more than five months delinquent; and (6) furnishing false negative credit information to the Credit Reporting Agencies when SPS knew and acknowledged that Plaintiffs had made all requisite payments to the SPS account.

242. SPS's attempt to collect upon a debt from Plaintiffs was harassing, improper, and invalid. SPS sought to collect more than what was due by Plaintiffs under the terms of the mortgage between the Parties.

243. SPS's conduct as alleged herein constitutes willful and intentional violations of the RFDCPA.

244. As a direct and proximate result of the wrongful acts of SPS, Plaintiffs have suffered from anxiety, worry, embarrassment, humiliation, mental anguish, and emotional distress. Plaintiffs have experienced emotional and mental symptoms caused by the wrongful acts of SPS. Plaintiffs have suffered past, present, and future damages in an amount to be determined according to proof at the time of trial.

39

**COMPLAINT FOR DAMAGES**

245.   SPS's conduct as stated herein violated the RFDCPA under the following sections: §§ 1788.10(f), 1788.13(j), and 1788.17, in addition to the violations asserted under the FDCPA in the preceding cause of action.

246.   As a result of SPS's violations of the RFDCPA, Plaintiffs are entitled to statutory damages in an amount of up to $1,000.00 in addition to reasonable costs and attorneys' fees, pursuant to California Civil Code § 1788.30.

## TENTH CAUSE OF ACTION

### Violations of the Electronic Funds Transfer Act

### (Against SPS)

247.   Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

248.   The purpose of the Electronic Funds Transfer Act ("EFTA") is "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b). The primary objective of the EFTA "is the provision of individual consumer rights." *Id*.

249.   An "error" consists of (a) **an unauthorized electronic fund transfer**; (b) an incorrect electronic transfer; (c) the omission from a periodic statement of an electronic fund transfer which should have been included; (d) a computation error by the financial institution; (e) the consumer's receipt of an incorrect amount of money from an electronic terminal; (f) a consumer's request for additional information or clarification concerning an electronic fund transfer or any documentation required by the Act, including a request the consumer makes to determine whether an error exists; or (g) any other error described in regulations of the Board of Governors of the Federal Reserve System. 15 U.S.C. § 1693f(f); 12 C.F.R. § 205.11.

250.   The EFTA defines an "electronic fund transfer" as "any transfer of funds . . . which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

credit an account." 15 U.S.C. 1693a(7). "Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, direct deposits or withdrawals of funds, and transfers initiated by telephone." (emphasis added) *Id*. "The term 'electronic terminal' means an electronic device, other than a telephone operated by a consumer, through which a consumer may initiate an electronic fund transfer. Such term includes, but is not limited to, point-of-sale terminals, automated teller machines, and cash dispensing." 15 U.S.C. 1693a(8).

251. In actions where the existence of an "error" is disputed, "the burden of proof is upon the financial institution to show that the electronic fund transfer was authorized." 15 U.S.C. § 1693g(b).

252. Courts have routinely recognized that the EFTA applies to third parties who debit consumer accounts without proper authorization, even when those parties are not themselves financial institutions. *In re Easysaver Rewards Litigation*, 737 F. Supp. 2d 1159 (2010); *Friedman v. 24 Hour Fitness USA, Inc.*, l580 F. Supp. 2d 985 (2008).

253. In *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1094-95 (N.D. Cal. 2006), the court noted that there was no indication either defendant was a financial institution; nonetheless, the court recognized that § 1693m provides "an enforcement mechanism" against non-financial institutions for violations of any provisions of the EFTA, including violations of EFTA's preauthorized transfers requirements under § 1693e. "The court recognized that the allegations that the defendants failed to obtain authorization from the plaintiffs prior to periodic electronic withdrawals from their financial accounts fell within the ambit of § 1693e governing preauthorized transfers." (*I.B. ex rel Fife v. Facebook, Inc.*, 905 F. Supp. 2d 989, 1006 (N.D. Cal. 2012).

254. An offending financial institution is liable to the consumer for (1) actual damages; (2) statutory minimum damages of not less than $100 nor greater than $1,000.00; and (3) mandatory costs of the action, together with reasonable attorney's fees. 15 U.S.C. § 1693m(a).

/ / /

41
**COMPLAINT FOR DAMAGES**

255. The pre-litigation notice requirement applies only to liability against financial institutions under § 1693h, whereas there is no notice requirements for liability against third parties who debit a consumer's account without first obtaining authorization. *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d at 995-996.

256. "[A] financial institution shall be liable to a consumer for ***all damages proximately caused by***—the financial institution's failure to make an electronic fund transfer, in accordance with the terms and conditions of an account, in the correct amount or in a timely manner when properly instructed to do so by the consumer . . . ." 15 U.S.C. § 1693h(a)(1).

257. Defendant SPS violated § 1693e of the EFTA by processing recurring payments from Plaintiffs' financial accounts without Plaintiffs' authorization or consent.

258. From May 2025 onwards, Plaintiffs prohibited SPS from processing automatic payments from Plaintiffs' financial institution, wherein Plaintiffs manually made their monthly payments to SPS, and SPS had informed Plaintiffs that under their policy, no further automatic payments would be processed—after SPS had lost Plaintiffs' automatic payment for May of 2025.

259. On August 29th, 2025, SPS unilaterally processed a withdrawal from Plaintiffs' financial account without first providing notice nor obtaining any prior authorization, permission, or consent from Plaintiffs to do so.

260. At the same time, Plaintiffs initiated their manual payment for their mortgage payment made to SPS, resulting in a double payment of Plaintiffs' monthly mortgage payment to SPS and causing substantial distress to Plaintiffs who were already having difficulty making ends meet.

261. Plaintiffs thereafter called SPS approximately a dozen times seeking relief from the unauthorized withdrawal wherein Plaintiffs expressly prohibit SPS from processing any further automated payments.

/ / /

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

262. In or about September of 2025, SPS unilaterally processed yet another unauthorized withdrawal from Plaintiffs' financial account, without notice, authorization, permission, or consent.

263. SPS has refused to return the second unauthorized automatic payment despite withdrawing the funds from Plaintiffs' financial account without Plaintiffs' authorization or consent.

264. Plaintiffs suffered damages as a result of SPS's violations of the EFTA.

265. SPS is liable for their violations of the EFTA under § 1693m.

266. Pursuant to 15 U.S.C. § 1693m, Plaintiffs seek statutory damages, actual damages, compensatory damages, and costs of suit and reasonable attorneys' fees from SPS.

## ELEVENTH CAUSE OF ACTION

### Violations of The Fair Credit Reporting Act (FCRA)

### (Against SPS, TransUnion, Equifax, and Experian)

267. Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

268. Congress enacted the Fair Credit Reporting Act ("**FCRA**"), "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 52 (2007).

269. "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995). Congress intended to promote efficiency in the nation's banking system and to protect consumer privacy. *TRW Inc. v. Andrews*, 534 U.S. 19, 24, 122 S. Ct. 441(2001) (citing 15 U.S.C. § 1681(a)).

/ / /

270. Congress addressed the latter concern by including provisions intended "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report. S. Rep. No. 91-517, at 1 (1969). Congress also hoped to address a number of related problems, including "the inability at times of the consumer to know he or she is being damaged by an adverse credit report," the lack of "access to the information in his or her file," the "difficulty in correcting inaccurate information," and "getting the consumer's version of a legitimate dispute recorded in . . . [his or her] credit file." Id. at 3 (1969). "These consumer oriented objectives support a liberal construction of the FCRA" and any interpretation of this remedial statute must reflect those objectives. *Guimond*, 45 F.3d at 1333.

271. Plaintiffs are consumers as defined by 15 U.S.C. § 1681a(c) of the FCRA.

272. In general terms, the FCRA imposes duties on two types of entities: credit reporting agencies and "furnishers of information." *See Cosmas v. Am. Express Centurion Bank*, 2010 WL 2516468 at *7 (D.N.J. June 14, 2010).

273. The FCRA provides for recovery of actual damages, statutory damages of $1,000.00 per violation, punitive damages, and reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1681n.

274. Statutory damages are recoverable for each and every violation of the FCRA. *Arcilla v. Adidas Promotional Retail Operations, Inc.*, 488 F. Supp. 2d 965 (C.D. Cal. 2007).

275. "Damages recoverable under the FCRA 'include humiliation or mental distress, even if the consumer has suffered no out-of-pocket losses' due to a denial of credit." *Waddell v. Equifax Info. Servs., LLC*, No. CV 05-0092 PHX DGC, 2006 WL 2640557, 4* (D. Ariz Sept. 14, 2006).

276. The Central District of California has likewise permitted for the recovery of emotional distress damages for FCRA violations. *Grigoryan v. Experian Information Solutions, Inc.*, 84 Supp. 3d 1044, 1086 (C. D. Cal. 2014).

/ / /

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

**A. SPS's Liability under the FCRA as a Data Furnisher**

277.   To ensure that credit reports are accurate, the FCRA imposes duties on "furnishers," the sources that provide information to the credit reporting agencies ("**CRAs**"). A data furnisher is an entity that reports information relevant to a consumer's credit rating—i.e., payment history, amount of debt, and credit limit—to credit reporting agencies." *Burrell v. DFS Servs., LLC*, 753 F. Supp. 2d 438, 446 (D.N.J. 2010).

278.   There is no dispute that SPS is a "furnisher" of information.

279.   Section 1681s-2 sets forth two categories of duties on furnishers.

280.   The first category, Subsection (a), details the duty "to provide accurate information," and specifically includes the following:

(1) Prohibition

(A) Reporting information with actual knowledge of errors. A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate.

(B) Reporting information after notice and confirmation of errors. A person shall not furnish information relating to a consumer to any consumer reporting agency if—(i) the person has been notified by the consumer, at the address specified by the person for such notices, that specific information is inaccurate; and (ii) the information is, in fact, inaccurate.

(2) Duty to correct and update information. A person who (A) regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about the person's transactions or experiences with any consumer; and (B) has furnished to a consumer reporting agency information that the person determines is not complete or accurate, shall promptly notify the consumer reporting agency of that determination and provide to the agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the agency complete and accurate, and shall not thereafter furnish to the agency any of the information that remains

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

45

**COMPLAINT FOR DAMAGES**

> complete or accurate.
>
> (3) Duty to provide notice of dispute. If the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person may not furnish the information to any consumer reporting agency without notice that such information is disputed by the consumer.

15 U.S.C. § 1681s-2(a).

281.   The duty to provide accurate and complete information, including notice of a dispute, is constant. Once the furnisher is notified by the consumer through any means that the account information is disputed, the furnisher must include notice of that dispute any time it reports information about the account to the CRAs.

282.   Data furnishers are further required to perform a good faith investigation after receiving a notice of dispute either directly by the consumer pursuant to § 1681s-2(a)(8), or indirectly when the consumer disputes the accuracy of credit information with a credit reporting agency pursuant to § 1681s-2(b).

283.   SPS here violated their duties to provide accurate information to the credit reporting bureaus pursuant to 15 U.S.C. § 1681s-2(a)(1), § 1681s-2(a)(2), § 1681(a)(3), as well as their duty to conduct a reasonable and good faith investigation and correct the inaccurate credit information after Plaintiffs' notice of dispute pursuant to 15 U.S.C. § 1681s-2(1)(8) and § 1681s-2(b).

284.   Each time SPS received notice of Plaintiffs' dispute from the credit bureaus, it was required to "conduct a reasonable investigation of [its] records to determine whether the disputed information [could] be verified." *Schaffhausen v. Bank of America, N.A.*, 393 F. Supp.2d 853, (D. Minn. 2005), *citing Johnson v. MBNA Bank of America, NA*, 357 F. 3d 426, 431; *Malm v. Household Bank,* 2004 WL 1559370, at *4 (D. Minn. July 7, 2004).

/ / /

/ / /

285. A reasonable investigation "requires an inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute." *Gorman v. Wolpoff & Abramson*; 552 F.3d 1008, 1015 (9th Cir. 2010). "Rubber stamping" their prior reporting is not sufficient. *Id*. As stated by the Fourth Circuit:

> the plain meaning of "investigation" clearly requires some degree of careful inquiry by creditors. Further, § 1681s-2(b)(1)(A) uses the term "investigation" in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute-and, ultimately, correct-inaccurate information on their credit reports, Congress used the term "investigation" to include superficial, unreasonable inquiries by creditors.

*Johnson v. MBNA Bank of America, NA*, 357 F.3d 426, 430-31; see also *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 148 (4th Cir. 2008); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012); *Gorman*, 552 F. 3d at 1163.

286. Accordingly, furnishers are required to determine whether the information that they previously reported to a CRA is "incomplete or inaccurate." 15 U.S.C. § 1681s-2(b). If a furnisher fails to comply with their obligations under § 1681s-2(b), the FCRA authorizes a consumer to assert a private cause of action.

287. SPS is a data furnisher required to comply with all applicable sections of the FCRA.

288. A duty to act is triggered when a furnisher of information "receiv[es] notice … of a dispute with regard to the completeness or accuracy of any information provided by [the furnisher] to a consumer reporting agency . . . ." 15 U.S.C. § 1681s-2(b)(1).  After receiving notice of the dispute from a CRA, the furnisher must:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i (a)(2) of this title;

(C) report the results of the investigation to the consumer reporting agency;

47
**COMPLAINT FOR DAMAGES**

(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation, promptly:

(i) modify that item of information;

(ii) delete that item of information; or

(iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1) (emphasis added).

289.   As has been interpreted by the Courts: the plain meaning of "investigation" clearly requires some degree of careful inquiry by creditors. Further, § 1681s-2(b)(1)(A) uses the term "investigation" in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute-and, ultimately, correct-inaccurate information on their credit reports, Congress used the term "investigation" to include superficial, unreasonable inquiries by creditors. *Johnson v. MBNA Bank of America*, NA, 357 F.3d 426, 430-31. (4th Cir. 2004).

290.   To meet this standard, data furnishers may need to consult underlying documents such as account applications, for example, rather than simply reviewing data in computerized customer information systems. *Id.*

291.   SPS failed to update Plaintiffs' accounts as disputed after investigation. *See Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 148 (4th Cir. 2008); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009).

/ / /

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

48
**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

292.   In or about June of 2025, SPS furnished negative credit information of both Plaintiffs to the Credit Reporting Agencies.

293.   SPS had actual knowledge of the falsity of the negative credit information whereas SPS had already acknowledged and affirmed with Plaintiffs that SPS lost Plaintiffs' May 2025 mortgage payment. SPS knew Plaintiffs were in fact not delinquent on their SPS account; nonetheless, SPS furnished negative credit information to the Credit Reporting Agencies—falsely informing the Credit Reporting Agencies, and each of them, that Plaintiffs defaulted on their SPS Account by failing to pay their May 2025 mortgage payment.

294.   SPS falsely furnished negative credit information to the Credit Reporting Agencies without informing the Credit Reporting Agencies of the fact that Plaintiffs disputed the negative credit information, and while SPS knew that the negative credit information was false. SPS furnished the false negative credit information to the Credit Reporting Agencies without reporting the disputed nature of the negative credit information and without regard to the accuracy of the negative credit information.

295.   In or about June of 2025, Plaintiffs disputed the negative credit information furnished by SPS with the Credit Reporting Agencies Equifax and TransUnion.

296.   Upon receiving notice of Plaintiffs' dispute with the Credit Reporting Agencies of the accuracy of the information furnished by SPS, they violated 15 U.S.C. § 1681s-2(b) by failing to conduct a good faith, reasonable investigation of the dispute as required by § 1681s-2(b)(1).

297.   When Plaintiffs disputed the negative credit information on their consumer credit reports in or about June of 2025, SPS had a duty to conduct a good faith investigation of the dispute and to correct the negative credit information SPS furnished to the Credit Reporting Agencies.

/ / /

/ / /

/ / /

49

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

298. SPS refused and/or failed to conduct a good faith investigation into the disputed credit information; instead, SPS merely "rubber stamped" the previously reported, false, negative credit information and reported the previously reported information as accurate.

299. SPS failed and/or refused to accurately modify the false, negative credit information it furnished to the Credit Reporting Agencies.

300. After disputing the negative credit information furnished by SPS, Plaintiffs received the results of their dispute from Equifax and TransUnion. The dispute results from Equifax for both Plaintiffs stated: "This Creditor has verified to our company that the prior paying history is being reported correctly . . . Delinquency Status Past Due. If you have additional questions about this item please contact: SelectPort, 3815 S West Temple, Salt Lake City, UT 84115-4412." The dispute results from TransUnion for Plaintiff Brian Henderson stated: "We investigated the information you disputed and the disputed information was VERIFIED AS ACCURATE . . . Past Due; Pay Status; Maximum Delinquency."

301. SPS's investigations were unreasonable. SPS should have discovered from their own records, including Plaintiffs' formal dispute, that the information being furnished was inaccurate and materially misleading since Plaintiffs were in fact current on all payments for their SPS Account. By failing to properly investigate the dispute, SPS violated 15 U.S.C. § 1681s-2(b).

302. As a direct and proximate result of SPS's willful action and inaction, Plaintiffs have suffered actual damages, including but not limited to strenuously reviewing their credit reports, preparing and issuing dispute letters, attorneys' fees, loss of credit, loss of ability to purchase and benefit from credit, increased costs of credit, mental and emotional pain and anguish, and humiliation and embarrassment of credit denials. Plaintiffs have further spent countless hours and suffered pecuniary loss in attempting to correct SPS's inaccurate and derogatory information, without success.

/ / /

50

**COMPLAINT FOR DAMAGES**

303. Specifically, Plaintiffs' credit lines have been substantially reduced by approximately $170,000.00 jointly between both Plaintiffs. Plaintiff Van Selus has been unable to effectively operate her personal clothing business due to having her credit lines reduced and thereof being unable to purchase the requisite materials for her tailored clothes. Plaintiffs have been routinely denied financing opportunities, including but not limited to being denied for financing a new car to safely drive their children in when their prior car started demonstrating serious safety defects.

304. Plaintiffs seek statutory damages of $1,000.00 per violation of the FCRA by SPS, and/or actual damages, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n and § 1681o.

305. SPS's conduct as alleged hereinabove was furthermore criminal, oppressive, malicious, willful and intended to harm and did harm Plaintiffs, warranting imposition of exemplary damages pursuant to 15 U.S.C. § 1681n(a)(1)(2).

**B. Credit Reporting Agencies FCRA Liability for Initially Reporting of False Negative Credit Information**

306. "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). This duty exists from the moment a credit reporting agency prepares a consumer report and does not require that the consumer first dispute the accuracy or completeness of the information on their consumer report. *Id*.

307. "Liability under § 1681e(b) is predicated on the reasonableness of the credit reporting agency's procedures in obtaining credit information." *Guimond v. Trans Union Credit Information Co.*, 45 F. 3d 1329, 1333 (9th Cir. 1995).

308. "[T]o make out a prima facie violation under § 1681e(b), a consumer must present evidence tending to show that a credit reporting agency prepared a report containing inaccurate information." *Id*. The CRA may only "escape liability if it establishes that an inaccurate report was generated despite the agency's following

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

reasonable procedures. The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases." *Id*.

309. Liability for CRAs under § 1681e(b) "is predicated on the reasonableness of the CRA's procedures in obtaining credit information." *Taylor v. First Advantage Background Services Corp.*, 207 F. Supp. 3d 1095, 1101 (N.D. Cal. 2016).

310. To satisfy the obligations under § 1681e(b), a CRA must show that it "accurately transcribes, stores and communicates consumer information received from a source that it reasonably believes to be reputable, and which is credible on its face[.]" *Grigoryan v. Experian Information Solutions, Inc.*, 84 Supp. 3d 1044, 1067 (C. D. Cal. 2014).

311. While "some sources of information are sufficiently trustworthy that CRAs are initially entitled to rely on them as a matter of law . . . a source of information that is shown to suffer from 'systemic problems'" requires that the CRA not treat the information as "presumptively reliable." *Young v. Experian Information Solutions, Inc.*, 776 F. Supp. 3d 721, 739-740 (N.D. Ill. 2025).

312. "The reasonableness of relying on the source must be determined by reference to the prevalence or frequency of those errors, and the costs of detecting the errors prior to issuing a consumer report." *Id*.

313. Here, all three of the Credit Reporting Agencies received inaccurate and incomplete negative credit information from SPS showing non-payment of Plaintiffs' mortgage for the month of May 2025.

314. Indisputably, SPS is not a reputable source of information that the Credit Reporting Agencies may facially rely on whereas SPS is routinely reported to improperly manage consumer mortgage accounts and to provide misinformation concerning the accuracy of consumer mortgage accounts.

315. Consumers notoriously complain of SPS providing false information and miscommunications about the accuracy of their mortgage accounts.

/ / /

316. SPS is notorious for poor management of consumers mortgage accounts.

317. This poor reputation was publicly available information and was at all times available to the Credit Reporting Agencies when preparing consumer reports.

318. In fact, SPS maintains a rating of 1.1 stars with 971 reviews on Consumer Affairs[4], 1.5 stars on Google Maps with 85 reviews[5], and has received 416 complaints in the last three years as reported by the Better Business Bureau[6] for mismanaging consumer mortgage accounts.

319. By accepting SPS's falsely furnished information at face value, despite SPS's indisputable lack of credibility, and preparing consumer reports concerning Plaintiffs with the false information furnished by SPS, the Credit Reporting Agencies, and each of them, violated § 1681e(b).

320. As a direct and proximate result of the Credit Reporting Agencies willful and/or negligent violations of the FCRA, Plaintiffs have suffered actual damages, including but not limited to strenuously reviewing their credit reports, preparing and issuing dispute letters, attorneys' fees, loss of credit, loss of ability to purchase and benefit from credit, increased costs of credit, mental and emotional pain and anguish, and humiliation and embarrassment of credit denials. Plaintiffs have further spent countless hours and suffered pecuniary loss in attempting to the inaccurate and derogatory information, without success.

321. Specifically, Plaintiffs' credit lines have been substantially reduced by approximately $170,000.00 jointly between both Plaintiffs. Plaintiff Van Selus has been unable to effectively operate her personal clothing business due to having her credit lines reduced and thereof being unable to purchase the requisite materials for her

---

[4] https://www.consumeraffairs.com/finance/select_portfolio.html.
[5] https://www.google.com/maps/place/Select+Portfolio+Servicing/@40.6982451,-112.0917574,22939m/data=!3m1!1e3!4m6!3m5!1s0x87528b575b7381bf:0x96ecc8dc2e8ca52a!8m2!3d40.7017291!4d-111.9469942!16s%2Fg%2F11hdz87nc2?entry=ttu&g_ep=EgoyMDI2MDQxMi4wIKXMDSoASAFQAw%3D%3D
[6] https://www.bbb.org/us/ut/salt-lake-city/profile/mortgage-broker/select-portfolio-servicing-inc-1166-2003108/complaints

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

tailored clothes. Plaintiffs have been routinely denied financing opportunities, including but not limited to being denied for financing a new car to safely drive their children in when their prior car started demonstrating serious safety defects.

322.   Plaintiffs seek statutory damages of $1,000.00 per violation of the FCRA by the Credit Reporting Agencies, and each of them, or in the alternative actual damages sustained by Plaintiffs, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n and § 1681o.

**C. FCRA Liability of Equifax and TransUnion for Failing to Correct False Negative Credit Information Following Plaintiffs' Disputes**

323.   The FCRA mandates that a consumer credit agency conduct a reasonable reinvestigation of reported consumer information when "the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly[.]" 15 U.S.C. § 1681i(a)(1)(A).

324.   Liability arises under § 1681i when: (1) the consumer lodges a dispute; and (2) the consumer reporting agency fails to perform a reasonable investigation into the accuracy or completeness of the disputed information. *Norman v. Trans Union, LLC*, 479 F. Supp. 3d 98, 120 (E.D. Penn. 2020).

325.   "A credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice . . . [because once] a credit reporting agency receives such notice, it can target its resources in a more efficient manner and conduct a more thorough investigation." *Henson v. CSC Credit Services*, 29 F. 3d 280, 286-287 (7th Cir. 1994).

326.   "[T]he text and structure of the FCRA's investigation provisions 'evince[] Congress's intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear grave responsibilities to ensure the accuracy of that information.'" *Norman*, *supra*, at 120 quoting *Cushman v. Trans Union Corp.,* 115 F. 3d 220, 225 (3rd Cir. 1997)

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

327. [T]he 'grave responsibilities' imposed by the FCRA require that a § 1681i(a) reinvestigation 'must consist of something more than merely parroting information received from other sources.'" *Id.*

328. The reasonableness of the investigation requires some degree of careful consideration by creditors and more than just a "superficial" inquiry, making it a question of fact reserved to be determined by the jury. *Childers v. Rent-A-Center East, Inc.*, 751 F. Supp. 3d 650, 662 (E.D. La. 2024).

329. While "some sources of information are sufficiently trustworthy that CRAs are initially entitled to rely on them as a matter of law . . . a source of information that is shown to suffer from 'systemic problems'" requires that the CRA not treat the information as "presumptively reliable." *Young v. Experian Information Solutions, Inc.*, 776 F. Supp. 3d 721, 739-740 (N.D. Ill. 2025).

330. "The reasonableness of relying on the source must be determined by reference to the prevalence or frequency of those errors, and the costs of detecting the errors prior to issuing a consumer report." *Id.*

331. This matter is similar to the case of *Saenz v. Trans Union, LLC*, 621 F. Supp. 2d 1074, 1082-83 (D. Or. 2007). There, "Saenz' July 2004 credit report clearly contained inaccurate information and Saenz disputed the inaccurate information in good faith. In connection with his [] dispute, evidence in the record establishes that Saenz provided Trans Union with documents suggesting that the NCO balance had been paid in full. [The Court determined that] Trans Union was provided with documentary evidence sufficient to place it on notice of the likelihood that NCO's information was inaccurate . . . [and] that the agency's reinvestigation was unreasonable." *Id.*

332. In or about June of 2025, Plaintiffs diligently disputed the inaccurate and/or incomplete information on the consumer reports of Equifax and TransUnion concerning the SPS delinquency.

/ / /

/ / /

333. Equifax and TransUnion failed to conduct a reasonable investigation as required by § 1681i. Instead, Equifax and TransUnion merely rubber-stamped the information provided by SPS who is undisputably an unreliable source of information—having a reputation for mismanagement of consumer mortgage accounts.

334. Equifax and TransUnion had an obligation under § 1681i to conduct their own independent investigation and to review all relevant information related to Plaintiffs' dispute, including the information provided by Plaintiffs. The information provided by Plaintiffs in their dispute was sufficient to conclude that the information provided by SPS was inaccurate and/or incomplete. Equifax and TransUnion nonetheless responded to Plaintiffs' dispute by falsely confirming the accuracy of SPS's furnished information.

335. In or about June of 2025, Equifax and TransUnion responded to Plaintiffs' disputes by stating that the information provided by SPS had been verified as accurate.

336. This response by Equifax and TransUnion failed to address the discrepancies and inaccuracies identified by Plaintiffs.

337. Equifax's and TransUnion's reinvestigation of the disputed credit information was unreasonable and violated § 1681i.

338. Equifax's and TransUnion's violations of § 1681i was willful.

339. Equifax's and TransUnion's violations of § 1681i was negligent.

340. As a direct and proximate result of the Credit Reporting Agencies willful and/or negligent violations of the FCRA, Plaintiffs have suffered actual damages, including but not limited to strenuously reviewing their credit reports, preparing and issuing dispute letters, attorneys' fees, loss of credit, loss of ability to purchase and benefit from credit, increased costs of credit, mental and emotional pain and anguish, and humiliation and embarrassment of credit denials. Plaintiffs have further spent countless hours and suffered pecuniary loss in attempting to the inaccurate and derogatory information, without success.

/ / /

56

**COMPLAINT FOR DAMAGES**

341. Specifically, Plaintiffs' credit lines have been substantially reduced by approximately $170,000.00 jointly between both Plaintiffs. Plaintiff Van Selus has been unable to effectively operate her personal clothing business due to having her credit lines reduced and thereof being unable to purchase the requisite materials for her tailored clothes. Plaintiffs have been routinely denied financing opportunities, including but not limited to being denied for financing a new car to safely drive their children in when their prior car started demonstrating serious safety defects.

342. Plaintiffs seek statutory damages of $1,000.00 per violation of the FCRA by the Equifax and TransUnion, or in the alternative actual damages sustained by Plaintiffs, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n and § 1681o.

## TWELFTH CAUSE OF ACTION

### Violations of the California's Consumer Credit Reporting Agencies Act
### (Against SPS, TransUnion, Equifax, and Experian)

343. Plaintiffs hereby incorporate by reference each and every allegation contained in all paragraphs of this Complaint as though fully set forth within this cause of action.

344. The California Consumer Credit Reporting Agencies Act ("**CCRAA**") was enacted by legislature to "regulate consumer credit reporting agencies . . . in a manner which will best protect the interests of the people of the State of California [and with the understanding that t]here is a need to insure that consumer credit reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." Cal. Civ. Code § 1785.1.

345. With respect to furnishers, the CCRAA prohibits furnishers from "furnish[ing] information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." Cal. Civ. Code § 1785.25(a).

/ / /

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

346. Furnishers who "determine[] that information on a specific transaction or experience so provided to a consumer credit reporting agency is not complete or accurate [are required to] promptly notify the consumer credit reporting agency of that determination and provide to the consumer credit reporting agency any corrections to that information, or any additional information, that is necessary to make the information provided by the person to the consumer credit reporting agency complete and accurate." Cal. Civ. Code § 1785.25(b).

347. Pursuant to Cal. Civ. Code § 1785.25(c), when there is "a continuing dispute between the affected consumer and that [furnisher], the [furnisher] may not furnish the information to any consumer credit reporting agency without also including a notice that the information is disputed by the consumer."

348. While the FCRA preempts certain obligations imposed by states with respect to "furnishers," the FCRA provides an express exemption from the general preemption "with respect to section 1785.25(a) of the California Civil Code." 15 U.S.C. § 1681t(b)(1)(F)(ii). "The FCRA provides that '[n]o requirement or prohibition may be imposed under the laws of any State . . . relating to the responsibilities of persons who furnish information to consumer reporting agencies.' 15 U.S.C. § 1681t(b)(1)(F). Nevertheless, [the FCRA] expressly saves from preemption 'section 1785.25(a) of the California Civil Code.' . . . Therefore, we held that 'the private right of action to enforce California Civil Code section 1785.25(a) is not preempted by the FCRA.'" *Carvalho v. Equifax Information Services, LLC*, 629 F. 3d 876, 888 (9th Cir. 2010) *quoting Gorman v. Wolpoff & Abramson, LLP*, 584 F. 3d 1147, 1173 (9th Cir. 2009).

349. The CCRAA requires "consumer credit reporting agencies . . . follow reasonable procedures [when preparing] a consumer credit report . . . to assure maximum possible accuracy of the information concerning the individual about whom the report relates." Cal. Civ. Code § 1785.14(b).

/ / /

/ / /

58

**COMPLAINT FOR DAMAGES**

350. The CCRAA expressly requires "permanent retention by the consumer credit reporting agency in the consumer's file, or a separately individualized file, of that portion of the data in the file that is used by the consumer credit reporting agency to identify the individual consumer[.]" Cal. Civ. Code § 1785.14(b).

351. "Under the statutes, a credit reporting agency must have in place reasonable procedures to ensure **maximum possible accuracy** and *follow them*." *Cisneros v. U.D. Registry, Inc.*, 39 Cal. App. 4th 548, 575 (1995) ("***Cisneros***").

352. To satisfy the obligations under § 1681e(b), a CRA must show that it "accurately transcribes, stores and communicates consumer information received from a source that it reasonably believes to be reputable, and which is credible on its face[.]" *Grigoryan v. Experian Information Solutions, Inc.*, 84 Supp. 3d 1044, 1067 (C. D. Cal. 2014) "[T]he court concludes that California courts would interpret the CCRAA similarly, and permit a credit reporting agency, as part of its 'reasonable procedures to ensure accuracy' under § 1785.14(b), to rely on facially credible reports from reputable sources." *Id.* at 1068 *citing Olson v. Six Rivers National Bank*, 111 Cal. App. 4th 1, 12 (2003).

353. While "some sources of information are sufficiently trustworthy that CRAs are initially entitled to rely on them as a matter of law . . . a source of information that is shown to suffer from 'systemic problems'" requires that the CRA not treat the information as "presumptively reliable." *Young v. Experian Information Solutions, Inc.*, 776 F. Supp. 3d 721, 739-740 (N.D. Ill. 2025).

354. "The reasonableness of relying on the source must be determined by reference to the prevalence or frequency of those errors, and the costs of detecting the errors prior to issuing a consumer report." *Id*.

355. A consumer credit report violates the CCRAA "when it is misleading or incomplete, even if it is technically accurate." *Cisneros*, 39 Cal. App. 4th at 579.

/ / /

/ / /

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

356. Upon receipt of a dispute of the completeness or accuracy of any item of information, a consumer credit reporting agency must conduct a reasonable reinvestigation of the item in dispute within 30 business days. Cal. Civ. Code § 1785.16(a, b).

357. "In conducting that reinvestigation the consumer credit reporting agency shall review and consider all relevant information submitted by the consumer with respect to the disputed item of information." Cal. Civ. Code § 1785.16(b).

358. Pursuant to California Civil Code § 1785.16(a), the consumer credit reporting agency must notify the furnisher of the information of the dispute within five (5) business days of receiving the consumer's dispute, unless the consumer credit reporting agency deems the dispute to be frivolous or irrelevant.

359. A consumer credit reporting agency must provide the results of the reinvestigation of the disputed information to the consumer within five business days of its completion, as well as a description of the procedure used to determine the accuracy and completeness of the information within fifteen (15) days of the consumer's request. Cal. Civ. Code § 1785.16(d).

360. Pursuant to California Civil Code Section 1785.16(e), the existence of information in the consumer's file that contradicts the consumer's dispute does not alone constitute reasonable grounds for considering the dispute as frivolous or irrelevant.

361. "Whenever a statement of dispute is filed, the consumer credit reporting agency shall, in any subsequent consumer credit report containing the information in question, clearly note that the information is disputed by the consumer and shall include in the report either the consumer's statement or a clear and accurate summary thereof." Cal. Civ. Code § 1785.16(g).

362. "It is well settled that exclusive reliance on ACDV procedures does not suffice, as a matter of law, to establish that a 'reasonable investigation' took place once a consumer disputes the accuracy of the furnisher's information." *Grigoryan v.*

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

*Experian Information Solutions, Inc.*, 84 Supp. 3d 1044, 1074 (C.D. Cal. 2014) ("***Grigoryan***") *citing Bradshaw v. BAC Home Loans Servicing, LP*, 816 F. Supp. 2d 1066, 1073-74 (D. Or. 2011) ["Many courts, including this one, have concluded that where a CRA is affirmatively on notice that information received from a creditor may be suspect, it is unreasonable as a matter of law for the agency to simply verify the creditor's information through the ACDV process without additional investigation."].

363.   "TransUnion seeks to deflect responsibility for this inaccuracy to the creditors upon whom it relies for information and falls back on its assertion that 'a creditor is in a better position than a consumer reporting agency with regard to the ability to detect and correct errors in the reporting of a consumer's account . . . This hardly suffices to establish, as a matter of law, that a 'reasonable reinvestigation' amounts to an inquiry that goes only to confirmation of the accuracy of information from its original source.'" *White v. Trans Union, LLC*, 462 SF. Supp. 2d 1079, 1083 (C.D. Cal. 2006).

364.   In Grigoryan, the Central District of California refused to permit entry of judgment in favor of the consumer credit reporting agencies on the issue of whether or not the CRAs conducted a reasonable reinvestigation following the consumer's dispute of a false delinquency appearing on the underlying consumer report. *Grigoryan*, 84 F. Supp. 3d at 1074. There, the CRAs merely established that the furnisher confirmed the accuracy of the negative credit information and that the CRAs facially relied on the confirmation by the furnisher. *Id*. The Court denied the motion for summary judgment by the CRAs, determining that a CRA is required to go beyond the scope of merely relying on a furnisher's confirmation of accuracy to conduct a reasonable reinvestigation, and otherwise, that the question of reasonableness is a question of fact reserved to be determined by the jury. *Id*.

365.   Courts have determined that while FCRA claims and CCR1AA claims typically mirror each other, nothing prevents a plaintiff from bringing claims under both, applicable federal and state laws—irrespective of the language included in

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

61

**COMPLAINT FOR DAMAGES**

California Civil Code § 1785.34. *See Cisneros*, 39 Cal. App. 4th at 581; *see also Flannery v. American Express Company*, Case No. CV237931MWFMARX, 2024 WL 648689, at *4 (C.D. Cal. Jan. 29, 2024).

366. In addition to statutory damages, special damages, and reasonable attorneys' fees and costs, the Central District has further permitted the recovery of emotional distress damages for claims under the CCRAA. *See Grigoryan*, 84 Supp. 3d at 1086.

367. Plaintiffs are consumers as that term is defined by Cal. Civ. Code § 1785.3(b).

368. SPS is a "person" as defined by Cal. Civ. Code § 1785.3(j). SPS is likewise a "person who [] in the ordinary course of business regularly and on a routine basis furnishes information to one or more consumer credit reporting agencies about the person's own transactions or experiences with one or more consumers[.]"

369. The above-referenced reports are "consumer credit reports" within the meaning of California Civil Code § 1785.3(c).

370. The disputed delinquency on Plaintiffs' consumer credit reports was an "item of information" as defined by California Civil Code Section 1785.3(i).

371. SPS violated § 1785.25(a) of the CCRAA by furnishing information to the Credit Reporting Agencies on Plaintiffs' second mortgage, serviced by SPS. SPS knew or should have known the information it furnished to the Credit Reporting Agencies, and concerning Plaintiffs' second mortgage, was incomplete or inaccurate. SPS falsely informed the Credit Reporting Agencies that Plaintiffs were delinquent on their SPS Account and that Plaintiffs had not paid the SPS Account for the month of May of 2025 when SPS previously confirmed to Plaintiffs that Plaintiffs had made the payment for the month of May 2025.

/ / /

/ / /

/ / /

62

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

372.   At the time that SPS furnished this false information to the Credit Reporting Agencies, SPS knew the information was false, or should have known the information was incomplete or inaccurate, whereas SPS previously acknowledged that SPS lost the payment Plaintiffs transmitted for the month of May 2025.

373.   SPS negligently and/or willfully failed to comply with the provisions of California Civil Code § 1785.25(a).

374.   The Credit Reporting Agencies, and each of them, negligently and/or willfully failed to comply with California Civil Code § 1785.14(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the information in their credit reports they prepared regarding Plaintiffs.

375.   Equifax and TransUnion negligently and/or willfully failed to comply with the procedures in California Civil Code § 1785.16 in response to Plaintiffs' disputes.

376.   Equifax and TransUnion failed to undertake a reasonable investigation into the accuracy and completeness of the item of information disputed by Plaintiffs.

377.   Equifax and TransUnion failed to mark the item of information disputed by Plaintiffs during the reinvestigation and/or following the reinvestigation of the dispute in violation of § 1785.16(g).

378.   SPS and the Credit Reporting Agencies failed to establish and to follow policies and procedures adequately designed to prevent the type of harm and violations of the law that Plaintiffs now assert herein.

379.   As a direct and proximate result of the wrongful acts of SPS and the Credit Reporting Agencies, Plaintiffs have suffered from anxiety, worry, embarrassment, humiliation, mental anguish, and emotional distress. Plaintiffs have experienced emotional and mental symptoms caused by the wrongful acts of SPS and the Credit Reporting Agencies. Plaintiffs have suffered past, present, and future damages in an amount to be determined according to proof at the time of trial.

/ / /

/ / /

63
**COMPLAINT FOR DAMAGES**

380.   SPS and the Credit Reporting Agencies are each liable to Plaintiffs pursuant to California Civil Code § 1785.31 for (1) actual damages, including loss of wages and pain and suffering; (2) punitive damages of not less than $100 nor more than $5,000 for each violation; (3) court costs and attorneys' fees; and (4) any other relief that the Court deems proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against Defendants as follows:

### A. As Against CCM

1. For actual, compensatory, and special damages in an amount exceeding the jurisdictional limit of this Court and according to proof at trial;

2. For restitution of all money CCM obtained by its wrongful conduct as alleged herein, including any profit earned;

3. For statutory damages of up to $4,000.00 for violations of the Truth in Lending Act and pursuant to 15 U.S.C. § 1640(a);

4. For rescission and/or reformation of the second CCM mortgage pursuant to 15 U.S.C. § 1635(f)(2);

5. For treble damages pursuant to California Penal Code § 496;

6. For recovery of reasonable attorneys' fees pursuant to 15 U.S.C. § 1640(a), 12 U.S.C. § 2605(f), and Cal. Penal Code § 496;

7. For punitive damages in an amount sufficient to deter SPS from continuing their fraudulent scheme and according to proof at trial;

8. For pre-judgment and post-judgment interest;

9. For costs of suit incurred herein; and

10. Any and all other relief the Court deems just and proper.

### B. As Against Love

1. For actual, compensatory, and special damages in an amount exceeding the jurisdictional limit of this Court and according to proof at trial;

2. For treble damages pursuant to California Penal Code § 496.

64

**COMPLAINT FOR DAMAGES**

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 – 1541

3. For recovery of reasonable attorneys' fees pursuant to Cal. Penal Code § 496;

4. For punitive damages in an amount sufficient to deter Love from continuing her fraudulent scheme and according to proof at trial;

5. For pre-judgment and post-judgment interest;

6. For costs of suit incurred herein; and

7. Any and all other relief the Court deems just and proper.

C. **As Against SPS**

1. For actual damages, compensatory damages, and special damages in an amount exceeding the jurisdictional limit of this Court and according to proof at trial;

2. For restitution of all money SPS obtained by its wrongful conduct as alleged herein, including any profit earned;

3. For statutory damages of up to $2,000.00 for SPS's violations of the RESPA pursuant to 12 U.S.C. § 2605(f);

4. For statutory violations of up to $1,000.00 for SPS's violations of the FDCPA pursuant to 15 U.S.C. § 1692k(a)(2)(A);

5. For statutory damages of up to $1,000.00 for SPS's violations of the RFDCPA pursuant to Cal. Civ. Code § 1788.30;

6. For statutory damages of up to $1,000.00 for SPS's violations of the EFTA pursuant to 15 U.S.C. § 1693m;

7. For statutory damages of up to $1,000.00 per SPS's willful violations of the FCRA pursuant to 15 U.S.C. § 1681;

8. For statutory and/or punitive damages of up to $5,000.00 for each of SPS's willful violations of the CCRAA pursuant to Cal. Civ. Code § 1785.31;

9. For treble damages pursuant to California Penal Code § 496;

10. For recovery of reasonable attorneys' fees pursuant to 12 U.S.C. § 2605(f), 15 U.S.C. § 1692k(a)(3), Cal. Civ. Code § 1788.30, 15 U.S.C. § 1693m, 15

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 – 1541

U.S.C. § 1681n, 15 U.S.C. § 1681o, Cal. Civ Code § 1785.31, and Cal. Penal Code § 496;

11. For punitive damages in an amount sufficient to deter SPS from continuing their fraudulent scheme and according to proof at trial;

12. For pre-judgment and post-judgment interest;

13. For costs of suit incurred herein; and

14. Any and all other relief the Court deems just and proper.

**D. As Against the Credit Reporting Agencies**

1. For actual, compensatory, and special damages in an amount exceeding the jurisdictional limit of this Court and according to proof at trial;

2. For statutory damages of up to $1,000.00 per willful violation of the FCRA pursuant to 15 U.S.C. § 1681;

3. For statutory and/or punitive damages of up to $5,000.00 for each willful violations of the CCRAA pursuant to Cal. Civ. Code § 1785.31;

4. For recovery of reasonable attorneys' fees pursuant to 15 U.S.C. § 1681n, 15 U.S.C. § 1681o, and Cal. Civ Code § 1785.31;

5. For pre-judgment and post-judgment interest;

6. For costs of suit incurred herein; and

7. Any and all other relief the Court deems just and proper.

Dated: April 27, 2026

Respectfully submitted,

**CONSUMER EQUITY LEGAL**

By: _____
Casey C. Daggett, Esq.
Attorney for Plaintiffs Ashlynne Van Selus and Brian Henderson

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

66

**COMPLAINT FOR DAMAGES**

**DEMAND FOR TRIAL BY JURY**

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiffs are entitled to, and hereby demand, a trial by jury.

Dated: April 27, 2026

Respectfully submitted,

**CONSUMER EQUITY LEGAL**

By: _____
Casey C. Daggett, Esq.
Attorney for Plaintiffs Ashlynne Van Selus and Brian Henderson

CONSUMER EQUITY LEGAL
43537 Ridge Park Drive Suite 100
Temecula, CA 92590
(951) 840 - 1541

67

**COMPLAINT FOR DAMAGES**